**STATE of Minnesota, Respondent,**

v.

**Timothy James DURFEE, Appellant.**

**No. 81–1042.**

Supreme Court of Minnesota.

Aug. 13, 1982.

C. Paul Jones, Public Defender, J. Christopher Cuneo, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Alan Mitchell, County Atty., Peter Banovetz, Asst. County Atty., Duluth, for respondent.

KELLEY, Justice..

Appellant was found guilty by a St. Louis County district court jury of first degree assault on Rose Tittman, the 13-month old daughter of his live-in girlfriend, committed on September 10, 1980. Appellant seeks reversal and a new trial on the grounds (1) that one of the state's witnesses was permitted to express his opinion as to whether this was a case of the "battered child syndrome"; (2) that the state erred in introducing evidence about the "battering parent syndrome"; (3) that it was error to admit photographs of the battered child in evidence following appellant's offer to stipulate that the child sustained great bodily harm as defined in the assault statute; and (4) that it was error to deny appellant's motion seeking a full "Schwartz" hearing to examine the possibility of jury misconduct. We affirm.

Rose Tittman is the daughter of Cyndee Tittman. Cyndee Tittman was a student at the Duluth Area Vocational School where she met appellant. In mid-summer 1980, appellant moved in with Cyndee and Rose. Since both Cyndee and appellant were in school beginning in August, they left Rose with a day-care person, Jan Polecheck,

Monday through Friday, usually between the hours of 9 a. m. and 3:30 p. m. On September 2, 1980, after Cyndee and appellant had dropped Rose at Mrs. Polecheck's house, Mrs. Polecheck noticed a large soft spot on the back of Rose's head. Appellant claimed that the evening before Rose had been walking around a coffee table when his Doberman dog ran into the room, bumped Rose and knocked her head against the table. Although Rose still had the soft spot the next day, she appeared otherwise to be fine. However, that night Cyndee noticed that Rose had five or six black and blue marks on her face. She asked Mrs. Polecheck if Rose had fallen during the day. When Mrs. Polecheck informed her that Rose had not fallen, Cyndee attempted unsuccessfully to call her doctor. Appellant then offered to take Rose to his family doctor the next day. On September 4, appellant had no school so he watched Rose all day. When Cyndee got home from school that evening, appellant told her that the doctor felt Rose had too much sugar in her diet and that was what was causing the red marks and bruises. In fact, appellant had not taken Rose to see a doctor because, as he stated, he felt that Rose had been "seeing too many doctors." He did discuss the marks with his mother, a registered nurse, who thought perhaps Rose was getting too much fresh fruit.

The following day, when appellant and Cyndee delivered Rose to Mrs. Polecheck, appellant told her, "We've got a problem child on our hands." He then explained about Rose's "blood sugar problem." That same day, Mrs. Polecheck noticed between five and seven black and blue marks on Rose's face, a reddish-purple line on one ear, two parallel red lines on her neck and a very deep burn in the palm of her right hand which was oozing and infected. Appellant sought to explain the burn by stating that while holding Rose he was looking at his aquarium and she must have touched the light bulb in a lamp nearby. He did not actually see it happen, but by the following morning the wound was blistered. At the trial, police officers testified that they ran a

test on the lamp by touching all of its parts after it had been burning for several hours, and as a result, concluded that Rose's hand would have had to remain on the lamp for several minutes in order to produce a burn of that nature.

Mrs. Polecheck noticed no new bruises or injuries to Rose on September 8 or 9, but on September 10 she noticed a large purplish-red bruise on the left side of Rose's head, just above the ear. When she noted this to Cyndee, she was informed that appellant had given Rose a part of a root beer float the night before, and the bruise must have been the result of her "high blood sugar problem," which Cyndee had been led to believe that Rose had. On September 10, Cyndee fed Rose and put her to bed about 7 p. m. A half hour later, Cyndee left to go to the grocery store. While Cyndee was gone, appellant commenced cleaning his aquarium. He heard Rose whine so he attempted to give her a bottle, which she refused. Then he put her back in her crib on her stomach and returned to his aquarium project. Shortly thereafter, he heard a noise like a banging against the wall. Since Rose was not crying he did not immediately check on her. When he did, he claims he found her in a corner of the crib underneath the mattress from the waist up and unconscious. Appellant claimed that a few days earlier a bracket on the crib had broken, and that he had repaired it with a string. He claimed the string had broken and that Rose had fallen head first. A hospital nurse, a fireman who answered the call and a chaplain at the hospital all testified that on the night in question, appellant first told them that Rose had fallen out of the crib but later claimed that the crib had collapsed catching Rose between the crib and the adjacent wall.

Following appellant's call for help, two firefighters and two paramedics with the ambulance arrived. They noticed bruises, the burn, the soft spot on Rose's head, discoloration around the left eye, an open scabbed wound over the left ear and bruises in the abdomen, groin and pelvic area.

After Rose was taken to the hospital, the nursing supervisor likewise noted the extensive bruising. Appellant explained to her that the bruising must have come when Rose was caught between the crib and the wall. When Rose arrived at the hospital, she was unconscious and twitching. The hospital staff decided the Duluth police department should be notified. Dr. Robert Donley, a specialist in neurosurgery, was called to the hospital to examine the baby. When he examined Rose, she was cyanotic and exhibited signs of increased pressure in her brain. A CAT scan, an x-ray of the brain and skull, revealed a blood clot that was compressing the right side of the brain. This revelation mandated immediate surgery. The clot was removed, but a portion of the skull which was cut away in the surgery could not be replaced, resulting in a depression on the right side of the child's head. Moreover, Rose was left partially paralyzed on her left side, and she may have lost the sight in one eye.

While the surgery was in progress, appellant and Cyndee conversed with the hospital's resident chaplain. At the trial, the chaplain testified that the appellant was "fearful of something serious." She also testified that appellant told her he "did not have the best relationship in the world" with his father.

Later that night, two police officers accompanied appellant to the house to take photographs of the crib. While one officer was setting up the camera equipment, the other noticed appellant was in the bedroom. When the officer went into the bedroom, he observed appellant attempting to remove a cardboard box from beneath the crib. Appellant told the officer that he was going to get some clothes for the baby. After the photography was completed, they all returned to the hospital, but appellant took no baby clothing with him.

Two days later, appellant was observed by a neighbor chopping up the crib with an ax. Appellant claimed that he did so as a result of Cyndee's aversion to going into the bedroom where the crib was located. The pieces of the crib were picked up and subse-

quently disposed of by appellant in a waste dump at the vocational school although there was rubbish pick-up service where he lived.

Dr. Donley testified that the type of injury Rose sustained is usually explained by some acute "acceleration" or "deceleration" force of sufficient magnitude to move the contents of the brain enough to stretch and tear a blood vessel in the brain. He did not believe the explanation that Rose's head had been pressed in the corner of her crib was consistent with the type of injury he saw.

Dr. Scott Burns was called because Rose was a patient at the Duluth Family Practice Center where he is a physician. His opinion was that there was an inconsistency between the history—the alleged crib collapse—and the injury. He opined that Rose was the victim of the "child abuse syndrome" which, he explained, doctors are trained to suspect as a diagnosis when a small child has unexplained multiple injuries greater than to be expected from the history as well as multiple bruises in various stages of healing.

Dr. Robert ten Bensel, pediatrician and Professor of Public Health and Pediatrics at the University of Minnesota, testified for the state. He first testified that the "battered child syndrome" has three specific elements: (1) an injury not caused by accident; (2) a story given that does not explain the injury; and (3) a pattern of injury, i.e., different points in time as opposed to a single episode. He also testified in general terms about the stresses that cause child abuse. After hearing a hypothetical question containing the facts of the case, his opinion was that this case fell within the "battered child syndrome," and that it was fairly typical. He explained that in his career he had seen a lot of small children who had fallen in or out of cribs, and that he had never personally seen or seen documents of a subdural hematoma which resulted from a crib injury. The doctor stated a subdural hematoma required force of considerable magnitude. He then went on to testify about a study of crib falls done in Michigan with over 260 cases over an extended period of time. None of the children in that study suffered subdural hematomas or permanent injuries. Finally, he stated that when he said "battered child syndrome" he was not indicating who might have been the battering custodian.[1]

Appellant produced the testimony of Dr. Angelo Bolea, a doctor of child psychology, who asserted that Rose's reaction to appellant was inconsistent with the reaction of a battered child to the person who battered it, but he admitted Rose's severe brain damage had to be considered in assessing her reactions.

Several of appellant's relatives and friends gave evidence tending to show that appellant was good with children, since he had cared for the children of some of them. Many also observed how good he was with Rose, and how he had assumed a large portion of her care.

At the trial, the state offered photographs of Rose's depressed skull as well as photographs taken during the surgery. The trial court ruled that the surgical photographs were too prejudicial and excluded them but allowed the photographs of the skull depression taken some time after the surgery. Appellant made timely objection under Minn.R.Evid. 403.[2]

Appellant's ex-sister-in-law was a witness in his defense. The night before the case was submitted to the jury, she was in a bar when one of the jurors approached her and intimated that if she would go out with him, he would vote in favor of defendant.

1. Originally, Cyndee Tittman had also been charged, but charges against her had been dismissed before the time of this trial.

2. During the course of the proceedings, appellant's attorney had stated:
 The fact the child has partial paralysis, and further the fact that the child will, in their opinion, have a permanent disability, all of those verbal testimonies will, in fact, meet the test of the statute and, in fact, have not even been challenged by the defense in the first trial, nor will they be challenged in this trial.

He also told her that he guessed that the jury would be "split" and currently stood at eight to four. The witness, being upset, called appellant's mother with whom appellant was then living. The next morning, appellant told an investigator for the public defender that some of the jurors knew some of the witnesses and that would be to his benefit. However, appellant's attorney did not find out about the incident until after the jury had retired to deliberate and until after the alternate juror had been dismissed. When the trial judge was alerted to the situation, he interviewed the witness involved and concluded appellant had waived his right to a *Schwartz* hearing because he knew about the alleged misconduct before the alternate juror had been dismissed and had failed to report it to his counsel or to the court.

■ 1. Appellant first claims that permitting Dr. ten Bensel to express his opinion that this was a case of the "battered child syndrome" was error. He contends that since the only real issue in the case was whether appellant had assaulted the baby, the doctor's opinion went to an ultimate fact and consequently invaded the province of the jury. By definition, the "battered child syndrome" means that the injury was not accidental, and since Rose was alone with him when she was injured, appellant argues that, in effect, Dr. ten Bensel was permitted to testify appellant was guilty of assault.

We have previously upheld convictions for felonious assaults on small children where, in the absence of direct evidence, there was circumstantial evidence to support a finding that the child has been the victim of successive non-accidental episodes of injury at the hands of someone else. As we explained in *Schleret v. State*, 311 N.W.2d 843 (Minn.1981), the term adopted by us to describe the offense is the "battered child syndrome." We there said:

Much of the evidence that can be gathered to show an instance of "battered child syndrome" is circumstantial. In allowing such evidence to support a conviction, this court has recognized that those felonious assaults are in a unique category. Most cases of felonious assault tend to occur in a single episode to which there are sometimes witnesses. By contrast, cases that involve "battered child syndrome" occur in two or more episodes to which there are seldom any witnesses. In addition, they usually involve harm done by those who have a duty to protect the child. The harm often occurs when the child is in the exclusive control of a parent. * * *

Crucial to identifying such cases are the discrepancies between the parent's version of what happened to the child when the injuries occurred and the testimony of medical experts as to what could not have happened, or must have happened, to produce the injuries.

*Id.* at 844–45. *See also State v. Loss*, 295 Minn. 271, 204 N.W.2d 404 (1973); McCoid, *The Battered Child and Other Assaults Upon the Family: Part One*, 50 Minn.L. Rev. 1 (1965).

As we noted in *State v. Goblirsch*, 309 Minn. 401, 246 N.W.2d 12 (1976), the phrase "battered child syndrome" has an accusatory connotation, yet it is intended to indicate only that the child was not injured accidentally and does not constitute an opinion as to whether any particular person injured the child.[3] *Id.* at 407, 246 N.W.2d at 15.

An argument similar to appellant's contention in this case was made in *State v. Wilkerson*, 295 N.C. 559, 247 S.E.2d 905 (1978). The North Carolina court there said:

Contrary to what defendant seems to argue, neither physician testified, nor should he have been permitted to do so, that the battered child syndrome from which this victim suffered was in fact caused by any particular person or class of persons engaging in any particular activity or class of activities. Nowhere in

---

**3.** Cases so holding from other jurisdictions include *People v. Jackson*, 18 Cal.App.3d 504, 95 Cal.Rptr. 919 (1971); *People v. Henson*, 33 N.Y.2d 63, 349 N.Y.S.2d 657, 304 N.E.2d 358 (1973).

the record did either physician express or purport to express an opinion as to defendant's guilt or innocence. On these kinds of factual questions the physicians would have been in no better position to have an opinion than the jury. *Id.* at 570, 274 S.E.2d at 911. In his testimony here, Dr. ten Bensel specifically stated that he was not indicating who the battering parent or custodian might have been.

After testifying about his own experience with falls of small children from beds and cribs, Dr. ten Bensel was asked if he was familiar with any scientific studies done about injuries resulting from crib falls. Over objection of defense counsel that it was speculative and lacked foundation, the doctor went on to describe a study made in Michigan.[4] Appellant contends the court erred in permitting this testimony. We agree. There is no foundation for the testimony on the Michigan study. The study was not identified with any specificity; its scientific reliability was not established; and the study itself was not available to counsel for cross-examination. This testimony is similar to evidence expressed in the form of statistical probabilities. While statistical probability evidence may be admissible in a criminal trial based upon empirical data collected in the course of scientific studies, it must have a demonstrable foundation. *State v. Carlson,* 267

N.W.2d 170 (Minn.1978); *People v. Collins,* 68 Cal.2d 319, 66 Cal.Rptr. 497, 438 P.2d 33 (1968); *State v. Sneed,* 76 N.M. 349, 414 P.2d 858 (1966); *Miller v. State,* 240 Ark. 340, 399 S.W.2d 268 (1966).[5] However, the doctor stated his own experience was the same as that of the study. Since Dr. ten Bensel's experience in this area was so vast, inclusion of the results of this Michigan study, in our view, was merely cumulative and thus non-prejudicial on the facts of the case.

We conclude that admission of the "battered child syndrome" as it was permitted in this case, was not error. The burden of going forward with the evidence was not shifted. The state met its burden of going forward with the evidence and also its burden of proof with the aid of testimony of an accepted medical diagnosis of "battered child syndrome." *State v. Best,* 89 S.D. 227, 232 N.W.2d 447 (1975); McCoid, *The Battered Child and Other Assaults Upon the Family: Part One, supra.*

2. Next, appellant contends that his due process rights were violated by the use of studies, statistics and observations about child abusers—the so-called "battering parent syndrome." In particular, appellant claims that a portion of Dr. ten Bensel's testimony established that those who are not biological parents care about the children in their home less than biological

---

**4.** The testimony in this respect is as set forth in the record:

> Mr. Banovetz: Doctor, you told about your personal experience with infants who have fallen in or from cribs. Are you familiar with any scientific studies done about injuries resulting from crib falls?
> Dr. ten Bensel: Yes, I am.
> Mr. Banovetz: And what was that?
> Mr. Newby: Objection, Your Honor. This is speculative. Also, it's a lack of foundation.
> The Court: Well, I think you can talk generally about crib falls, so I will overrule the objection. You may inquire about all these things on cross examination.
> Dr. ten Bensel: The issue of having an adequate history is so critical that people have undertaken studies to see whether, in fact, you know, if—for the pediatrician—if the patient says, "My child fell off the bed and onto the floor. That's why the child has the subdural hematoma."

> There's a large study that was done in Michigan which showed that there was no substantial injuries in over 260 some cases—a very large sample, over a six-year period of time—that suffered any subdurals or any permanent injuries.
> I have probably seen close to a hundred children who have fallen out of bed or cribs, and I have never personally seen any permanent injury or any subdural hematoma *as a result* of that kind of a fall out of a crib, and this is from heights from about three feet where the studies have been done, or even wedging a head.

**5.** Even if a proper foundation is laid for evidence of statistical probability, it may be error to receive it in a criminal case because of its exaggerated impact upon the jury. *State v. Carlson,* 267 N.W.2d 170, 176 (Minn.1978).

parents do. Since appellant was not a biological parent of Rose, he argues that the doctor's testimony "pointed the finger" at him as being the cause of the child's injuries. Our reading of the doctor's testimony indicates that appellant isolates and takes the doctor's statement in that respect out of the context of his total testimony. He testified that "attachment" was the "key issue in how * * * caretakers really care for their kids and love their kids." He then did indicate that "adoptive parents and foster parents and other caretakers do care in a quantitative difference. The quality of the bond of attachment is how well the child relates to the caretaker as a base of security. Anyone can attach to the child." In our view, this testimony was directed to the emphasis on the battered child including, among other things, the usual facts and circumstances governing the relationship between the caretaker and the child. No attempt was made to show a battering parent syndrome through testimony from Dr. ten Bensel.

 We held in State v. Loebach, 310 N.W.2d 58 (Minn.1981), that until the accused had put his character in evidence, it was error for the state to present the "battering parent syndrome" followed by specific evidence that the accused "fit the pattern." No attempt was made to do that in this case.[6] The record contains no reference to the "battering parent syndrome." The chaplain who talked with appellant at the hospital the night of Rose's injury testified that appellant stated to her that his relationship with his father was "not the best in the world," but she was not called to testify about appellant's relationship with his father. Even assuming that this casual reference plus evidence that appellant, on occasion, smoked marijuana which apparently was admitted relative to the burns on Rose's hand, constituted subtle references to appellant's character, it seems clear to us that the admission of that testimony does not constitute ground for reversal (1) because those references got into the record for purposes other than establishing that appellant fit the picture of a "battering parent"; (2) the jury was not given the profile of the "battering parent syndrome" by any witness; and (3) the restrictions against use of the "battering parent syndrome" in this type of case set out in Loebach were prospective only.[7] This is not to say that prosecutors may avoid the rule of Loebach by indirection. The emphasis in this type of criminal prosecution is on the "battered child" and the circumstances of a series of non-accidental injuries to that child.

3. Appellant next advances the argument that admission of certain photographs of Rose showing, in part, the gross nature and extent of her injuries was prejudicial. Appellant's counsel indicated on the record that appellant did not contest that Rose's injuries constituted great bodily harm. Therefore, he claims admission of the photographs had little or no probative value whereas admission did create an inflamatory and prejudicial effect on the jury.

 The admitted photographs of Rose relate to an element of this crime— great bodily harm. It is the general rule that a party may not automatically preclude his adversary's proof by an offer to stipulate. United States v. Spletzer, 535 F.2d 950, 955 (5th Cir. 1976). Photographs are generally admissible where they accurately portray anything which is competent for a witness to describe orally, and they are relevant to some material issue. The mere fact that they vividly bring to jurors

---

**6.** This case was tried before our decision in State v. Loebach, 310 N.W.2d 58 (Minn.1981). In that case, we said:

> We now hold that in future cases the prosecution will not be permitted to introduce evidence of "battering parent" syndrome or to establish the character of the defendant as a "battering parent" unless the defendant first raises that issue. (emphasis added)

Id. at 64.

**7.** Arguably, in this case appellant did put his character in issue especially with testimony from witnesses with respect to his treatment and relationship with children and specifically with Rose Tittman. However, this testimony was put in evidence after the witnesses for the state had completed their testimony.

the details of a shocking crime so as to tend incidentally to inflame the jury does not render the photographs inadmissible. *State v. DeZeler*, 230 Minn. 39, 41 N.W.2d 313 (1950). Admittedly, the appellant was not contending at trial that Rose did not suffer great bodily harm; the real issue was whether appellant intentionally caused that harm. The photographs were relevant on that issue because they provided demonstrable, visual evidence to the jury of the extent and severity of Rose's injuries indicating their cause and source. *Albritton v. State*, 221 So.2d 192, 196 (Fla.Dist.Ct.App. 1969).

4. Finally, appellant argues that the failure of the trial court to grant him a *Schwartz* hearing on juror misconduct was error.[8] One of the witnesses who testified for appellant—his ex-sister-in-law—was approached by a juror in a bar the night before the case was to be submitted to the jury. The juror made certain advances to her and informed her the jury was "split" eight to four. She reported this to appellant no later than the morning of the last day of the trial. Appellant did not report the incident to his attorney but did mention it to an investigator working for the public defender's office. At that time, the alternate juror had not been excused. Appellant's attorney did not learn of the incident or the conversation until after jury retired. The incident was not related to the trial judge until after the jury had returned its verdict. Following his conviction by the jury, appellant moved for a new trial and, in the motion, asked for a *Schwartz* hearing. The trial court scheduled such a hearing for June 4, 1981 but also scheduled a hearing for June 3, 1981, at which time the witness would first be interrogated. After hearing her testimony and other testimony, the court denied the motion for a *Schwartz* hearing, ruling that

appellant had conclusively waived any claim relating to juror misconduct, and that therefore such an inquiry was unnecessary. The granting of a *Schwartz* hearing is generally a matter of discretion for the trial court. *Zimmerman v. Witte Transportation Co.*, 259 N.W.2d 260, 262 (Minn.1977). This discretion also applies in a criminal case. *State v. Larson*, 281 N.W.2d 481 (Minn.), *cert. denied*, 444 U.S. 973, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979); *State v. Domabyl*, 272 N.W.2d 745 (Minn.1978). We find no abuse of discretion here. A party who learns of a misconduct of a juror during trial may not keep silent and then attempt to take advantage of it in the event of an adverse verdict. *State v. Adams*, 27 Ariz.App. 389, 555 P.2d 358 (1976); *State v. Roden*, 216 Or. 369, 339 P.2d 438 (1959). The information received by the appellant from the witness on the morning of the last day of the trial was that the jury stood eight to four. Because in the first trial arising out of this incident the jury had been unable to agree, undoubtedly appellant was aware that a "split" was favorable to him since a unanimous verdict was necessary for a conviction. The trial court's determination that appellant, with full knowledge of the claimed misconduct, concluded that the episode with the witness was favorable to him, and that he therefore did not report it to his counsel or to the court, is clearly sustained by the evidence.

Affirmed.

YETKA, J., took no part in the consideration or decision of this case.

---

8. *Schwartz v. Minneapolis Suburban Bus Co.*, 258 Minn. 325, 104 N.W.2d 301 (1960) held that when juror misconduct was alleged by a litigant, the matter should be brought to the attention of the trial judge immediately, and if it appears to the judge that the facts justify so doing, the court may summon the juror before him for examination in the presence of counsel and on the record.