**STATE of Minnesota, Respondent,**

v.

**Gloria Susan MORRISON, Appellant.**

No. CX–88–1254.

Court of Appeals of Minnesota.

March 21, 1989.

Review Denied April 26, 1989.

Hubert H. Humphrey, III, Atty. Gen., Jeanne J. Graham, Sp. Asst. Atty. Gen., St. Paul, Gary Fridell, Goodhue County Atty., Red Wing, for respondent.

C. Paul Jones, State Public Defender, Michael F. Cromett, Asst. State Public Defender, St. Paul, for appellant.

Heard, considered and decided by SHORT, P.J., and NIERENGARTEN and NORTON, JJ.

## OPINION

NIERENGARTEN, Judge.

The appellant asserts the evidence does not support her felony murder conviction, claims the trial court erred by admitting certain evidence and contends the double departure from the guidelines sentence is unwarranted by the facts. We affirm.

## FACTS

Appellant Gloria Morrison and James Olson moved into a farmhouse near Red Wing, Minnesota in early 1987 with Morrison's five-year-old daughter and three-year-old daughter. In May 1987, Morrison began working at a Cannon Falls nursing home while Olson stayed home and watched the children. On May 23, 1987 according to Olson, Morrison's older daughter cried out that the younger daughter had fallen. Olson claims he found the child lying upside down on a concrete floor wedged against a pig feeder and a fence. Olson claims he picked up the child, took her into the house and applied ice to a head bruise. Olson testified that he crushed some ice cubes with a night stick which was located in a closet near the kitchen.

Morrison testified that the child appeared all right the next day but said she noticed some bruising along her daughter's spine and near her hip when she gave the child a bath on May 25. Morrison also said she noticed some darkening around the child's eyes on May 26 or 27 when the forehead bruises were "lightening up." Morrison testified that the child vomited twice the afternoon of May 26 and again the next day. According to Morrison, the child acted like she did not feel well and may have had a slight temperature. Morrison testified that she was told by Olson in a telephone call on May 27 that the child seemed to feel better. Olson testified that he later found the younger child lying face up on the bedroom floor with fluid in her nose and mouth, tried to revive her and called Morrison at the nursing home.

The child was transported by ambulance to a hospital in Red Wing and then to a Rochester hospital where she died on May 29. Donor organs were removed on May 29 and an autopsy was performed on May 30. Both procedures were observed by the coroner for Olmsted County.

The coroner concluded the child died from aspiration pneumonia resulting from closed head injuries caused by child abuse and classified the death as a homicide. Morrison and Olson subsequently were charged with several criminal counts.

Eight nurses from the two hospitals testified that there were multiple bruises of different colors and ages over the child's entire body. Five nurses said they had never seen such extensive bruising.

Physicians from both hospitals testified that the child's body was covered with multiple bruises and that the different coloring of the bruises indicated that the injuries occurred over a period of time. The physicians stated that the injuries were not consistent with the alleged fall in the pig pen on May 23; one doctor said he thought the injuries were "inflicted" and another doctor testified that he had "never seen a child that's been this badly and extensively injured, regardless of the cause" and said there was no question in his mind that "this was the result of child abuse."

A pediatric forensic pathologist specializing in child abuse reviewed the autopsy and pathology reports and photographs of the child's body. The pathologist concurred with the coroner's conclusion about the cause of death and testified that there was physical evidence that the internal injuries were caused by "multiple blows to the abdomen," including "at least three blows of various ages" to the child's abdomen which were caused by "high force blows." The pathologist opined that the nature and locations of the injuries indicated the blows "were delivered by an object or a fist by another human being." The pathologist testified that the pig pen story was "inconsistent" with the extent and pattern of the child's bruising and head injuries and said the child was the "victim of a battered child syndrome."

The county coroner who testified about the child's head injuries and other significant injuries including multiple bruises, bone fractures not of recent origin and internal organ injuries "of varying age and location," said the bruising was the most extensive he had ever seen on one child, and found it "inconceivable" how such bruising could occur from one fall. The coroner added that some of the injuries could have been inflicted with the night stick found in Morrison's kitchen. The coroner's medical diagnosis was "battered child syndrome."

Morrison's five-year-old daughter testified that Olson swung her younger sister by the feet and hit her head on the ceiling,[1] that he had "kicked her down the steps" and that he had "drowned her in the tub." The older child stated at trial that she had never seen Olson hit her younger sister with a "bat." When asked whether she had ever told Morrison that Olson hurt her sister, the older child said: "No. Only once I did." The older child said she did not see her sister fall in the pig pen or tell Olson that her sister fell in the barn.

Some of the five-year-old's statements to a foster parent about incidents in which Olson abused her younger sister were corroborated by a social worker who had interviewed the five-year-old.

Friends and family members testified that they did not observe anything unusual about the children during the several weeks before the younger child's death except that the younger child had been stung by a bee on the side of her head.

Morrison testified that she saw the head bruise and bruising along the child's spine after the purported pig pen fall, but could not remember seeing many of the other bruises evident in the photographs of the child's body. Morrison said she was the sole custodian and caretaker of her daughters since early 1986 and stated the children were left in Olson's sole custody when she was gone or working. Morrison testified that she had seen nothing to make her suspect abuse and had not seen Olson use the night stick for any purpose at all.

An expert in child abuse testifying for the defense said he could not state an opinion about battered child syndrome without further investigation, but found there was no "conclusive evidence" of battered child syndrome.

The jury found Morrison guilty on three counts: (1) second degree murder (third degree assault), liability for crimes of an-

1. A private investigator testifying for the defense said the living room ceiling was a suspended ceiling which moved upward when pushed.

other; (2) neglect; and (3) malicious punishment of a child, liability for crimes of another. The court concluded Morrison's conduct constituted a single behavioral incident and sentenced her only on the felony murder verdict. However, the court imposed a 210–month sentence, an upward double departure from the guidelines sentence.

Morrison appeals raising several issues.

## ISSUES

1. Does the evidence support the felony murder conviction?

2. Did the trial court err by admitting into evidence the night stick seized from the appellant's kitchen?

3. Did the trial court err by admitting into evidence medical reports written by persons who did not testify at trial?

4. Did the trial court err by admitting into evidence color autopsy photographs?

5. Did the cumulative effect of the disputed evidence deprive the appellant of a fair trial?

6. Was the double upward departure in sentencing justified?

## ANALYSIS

### 1. Felony Murder Conviction

■ Morrison asserts the evidence does not show she intentionally aided, advised, counseled or conspired with Olson who abused the child. *See* Minn.Stat. § 609.05, subd. 1 (1986) (defining criminal liability for another's crimes). Morrison claims the injuries occurred when she was not present, contends the injuries were not readily apparent and asserts her conduct indicates she did not know of Olson's abuse.

In reviewing a claim of insufficiency of the evidence, [appellate courts] are limited to ascertaining whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged. We cannot retry the facts, but must take the view of the evidence most favorable to the state and must assume that the jury believed the state's witnesses and disbelieved any contradictory evidence. If the jury, giving due regard to the presumption of innocence and to the state's burden of proving the defendant's guilt beyond a reasonable doubt, could reasonably have found the defendant guilty, that verdict will not be reversed.

*State v. Merrill,* 274 N.W.2d 99, 111 (Minn. 1978) (citations omitted). It is the jury's function to weigh the credibility of witnesses. *See State v. Reichenberger,* 289 Minn. 75, 79–80, 182 N.W.2d 692, 695 (1970).

Although there is no evidence in the record showing Morrison actually abused the child, the evidence of sole care and custody, the evidence of obvious and extensive bruising occurring over the course of several days or, in the case of internal organ and skeletal injuries, over the course of several weeks, and the fact that the child was vomiting, feeling ill and running a temperature during the several hours before she lost consciousness, conclusively show Morrison must have known about her daughter's physical condition and that she was being abused by Olson. An expert testified that the child probably could have been saved if she had been taken to a doctor when those symptoms occurred and received timely medical attention for her head injuries.

Morrison's failure to protect her daughter from abuse, her failure to remove her daughter from the abusive home environment and her failure to seek timely medical attention for her daughter's injuries constitute "something more * * * than mere inaction." *See State v. Ulvinen,* 313 N.W.2d 425, 428 (Minn.1981). Morrison's failure to take any steps to thwart Olson's abusive conduct is a fact from which the jury reasonably could infer "the requisite mens rea for a conviction of aiding and abetting." *See State v. Strimling,* 265 N.W.2d 423, 429 (Minn.1978). The record contains sufficient evidence from which the jury reasonably could find Morrison intentionally aided, advised, counseled or conspired with Olson whose abusive conduct resulted in the fatal injuries. *See State v. Campbell,*

367 N.W.2d 454, 461 (Minn.1985) (whether the defendant played a passive role in the offense is a factual issue best decided at the trial court level).

### 2. Admission of Night Stick

■ Morrison contends the night stick seized from the farmhouse kitchen should not have been admitted into evidence and claims it was neither "connected to a crime" nor "a weapon with which the crime was committed." *See State v. Lubenow,* 310 N.W.2d 52, 56 (Minn.1981). Morrison also contends the admission of the night stick was prejudicial. Although there was no residue evidence on the night stick indicating that the stick had been used to inflict some of the injuries, witnesses testified that the child's bruise wounds were caused by blows to the body and resulted in tissue damage *beneath* the skin. The coroner testified that the night stick could have been used to inflict the child's injuries and that some of the bruising patterns were consistent with blows from the end of the night stick.

The officers who seized the night stick were conducting a lawful search under the authority of a valid search warrant and were looking for evidence in the kitchen area where Olson said he placed the call to the nursing home. The night stick was lying on the kitchen counter in plain view. The incriminating nature of the night stick was "immediately apparent" to the officers because the nature and form of the night stick rendered it readily recognizable as a weapon-like instrument and because the nature of the child's bruises suggested the night stick could have been used to inflict the injuries.

Evidence that in some degree advances the inquiry and therefore has probative value is relevant evidence and may be admitted. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. This determination rests within the sound discretion of the trial court and will only be reversed if the trial court abused its discretion.

*State v. Holscher,* 417 N.W.2d 698, 702 (Minn.Ct.App.1988), *pet. for rev. denied* (Minn. Mar. 18, 1988) (citations omitted).

Morrison contends there was no probable cause to believe the night stick caused any of the injuries and claims the night stick was illegally seized because it was not particularly described in the search warrant. *See* U.S. Const. amend. IV. However, there is a "plain view" exception to the prohibition against general searches.

> This exception is satisfied where an officer lawfully executing a search warrant, or otherwise engaged in a lawful intrusion, inadvertently comes across evidence whose incriminating nature is immediately apparent.

*State v. Streitz,* 258 N.W.2d 768, 772 (Minn.1977) (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971)).

The court did not abuse its discretion by admitting the night stick into evidence. The bruising pattern and testimony suggest the night stick is relevant evidence and it is not clear from the record that the probative value of the evidence is *"substantially* outweighed by the danger of unfair prejudice." *See* Minn.R.Evid. 403. *Cf. State v. Olek,* 288 Minn. 235, 242, 179 N.W.2d 320, 325 (1970) ("physical objects connected with a crime or which are the subject matter of an investigation are admissible").

### 3. Admission of Medical Records

■ Morrison asserts the trial court erred by admitting into evidence a written autopsy report by the autopsy physician that was included in the coroner's official file. The autopsy report was admissible because the report was developed and submitted to the coroner in the course of the coroner's duties. *See* Minn.R.Evid. 803(6) (records of regularly conducted business activity are admissible); *see also Murray v. Antell,* 361 N.W.2d 466, 469 (Minn.Ct.App. 1985). The written report also was admissible because it was a clinical report used by the coroner as a basis for forming his own opinion about the cause of the child's

death. *See* Minn.R.Evid. 703 (basis of opinion testimony by experts).

A similar analysis applies to the written report from the organ donor surgery, which was clinical in nature and described the condition of the child's internal organs and injuries. The coroner observed both the organ donor surgery and the autopsy, testified at trial and was cross examined at length by Morrison's and Olson's attorneys. The district court did not abuse its discretion by admitting the reports into evidence.

### 4. Admission of Color Autopsy Photographs

■ Morrison asserts the admission of color autopsy photographs was unnecessary and unduly prejudicial. The coroner testified that the extent and nature of the child's internal injuries were best demonstrated by the color photographs. The State's case against Morrison depended in part on its ability to prove the extent and age of the child's injuries. The record indicates the color photographs more accurately reflected the child's injuries and were more helpful for determining the extent and age of the injuries than were black and white photographs. The admission of photographs under these circumstances "is generally best left to the trial court." *State v. Nurmi*, 336 N.W.2d 65, 67 (Minn. 1983). The record indicates the trial court judge was mindful of the inflammatory nature of the exhibits and was hesitant about admitting the color photographs because of their graphic nature.

> Photographs are generally admissible where they accurately portray anything which is competent for a witness to describe orally, and they are relevant to some material issue. The mere fact that they vividly bring to jurors the details of a shocking crime so as to tend incidentally to inflame the jury does not render the photographs inadmissible.

*State v. Durfee*, 322 N.W.2d 778, 785–86 (Minn.1982) (citing *State v. DeZeler*, 230 Minn. 39, 46–47, 41 N.W.2d 313, 319 (1950)). We cannot conclude the court abused its discretion by admitting the color photo-

graphs into evidence. *Cf. Durfee*, 322 N.W.2d at 786 (photographs were relevant "because they provided demonstrable, visual evidence to the jury of the extent and severity of [the] injuries indicating their cause and source").

### 5. Cumulative Effect of Alleged Trial Errors

In addition to the alleged evidentiary errors, Morrison claims the cumulative effect of other improprieties during the trial resulted in an unfair trial.

Morrison argues her joint trial with Olson was prejudicial, but she never objected to the joint trial. In addition, the trial transcript indicates Morrison and Olson purposefully may have conducted their trial jointly in some respects.

Morrison also argues that the testimony of the State's medical witnesses was cumulative and highly prejudicial, but she raised no objection at trial to individual witnesses or to the number of witnesses testifying for the State.

A comment by the coroner that a scar under the child's chin was "not inconsistent with a cigarette burn," while possibly gratuitous, occurred at the end of the day. The court properly instructed the jury to disregard the comment when the trial continued the next day.

■ Exhibit references to cigarette burns and sexual abuse were not unduly prejudicial. The references were not substantiated by any of the witnesses and Morrison was not charged with sexual abuse.

■ The oldest daughter, although not placed under oath when she testified, indicated she knew what a lie was, what the truth was, and nodded her head when asked to promise to tell the truth. The child was administered the equivalent of an oath. *See* Minn.Stat. §§ 358.07(7), 358.10 (1988).

■ Morrison also argues that her older daughter's alleged out-of-court statement that "Jim killed [her sister]" was inadmissible. We concur with the district court which ruled that defense counsel opened

the door for the comment by its questioning during cross examination.

■ Morrison asserts that the prosecution unfairly attacked her character by questioning her about past drug problems and her ability to care for her children while she was using drugs. Since the questioning was generally relevant to Morrison's care of the children and was made during cross examination, we cannot conclude the questioning was "unfair" or unduly prejudicial.

After reviewing the entire record, we cannot conclude the minor "improprieties" which occurred over the course of the three-week trial had a cumulative effect which resulted in an unfair trial.

### 6. Upward Durational Departure

■ The district court imposed a sentence which is double the presumptive guidelines sentence because it concluded there were substantial and aggravating circumstances justifying the upward departure. *See* Minn. Sentencing Guidelines § II.D. The district court may exercise its discretion in deciding to depart from the guidelines sentence. *State v. Garcia,* 302 N.W.2d 643, 647 (Minn.1981). In determining whether to depart from a presumptive sentence, a court should:

> (1) consider whether any mitigating or aggravating factors are present, (2) determine whether these circumstances are substantial and compelling circumstances justifying departure, and (3) if there are substantial and compelling circumstances, decide whether or not to depart. If the trial court decides to depart, it must make any necessary findings and give reasons justifying its decision so that meaningful review of the departure is possible.

*State v. Leibfried,* 309 N.W.2d 36, 36 (Minn.1981).

The district court doubled Morrison's presumptive sentence for several reasons: the child's vulnerability because of her young age and Morrison's position of trust and authority over her, the particular cruelty inflicted on the child as evidenced by her many bruises and internal injuries, Morrison's failure to provide medical attention, and the possible psychological harm to the older daughter from having to witness the abuse against her sister. Aggravating factors listed by the sentencing guidelines include the vulnerability of the victim because of age or reduced mental capacity and the "particular cruelty" with which the victim was treated. *See* Minn. Sentencing Guidelines § II.D.2.b.(1) & (2); *see also State v. Schmit,* 329 N.W.2d 56, 58 (Minn. 1983) (violating a position of trust may be an aggravating factor); *State v. Profit,* 323 N.W.2d 34, 36 (Minn.1982) (the presence of children during the commission of a crime justified a double-departure sentence).

The record shows that the child was bruised extensively over her entire body, that she was abused over a considerable period of time and that Morrison failed to obtain medical attention for her young daughter's injuries. Medical personnel who testified about the child's injuries stated they had never seen such extensive bruising and injury to a single child. Since the record indicates the child's bruising and internal injuries were unusually severe and other aggravating factors are present, we cannot conclude the district court abused its discretion by doubling Morrison's presumptive sentence.

### DECISION

The appellant's failure to protect her daughter from abuse, her failure to remove her daughter from the abusive environment and her failure to seek timely medical attention for her daughter's obvious injuries showed sufficient mens rea from which the jury reasonably could conclude the appellant intentionally aided and abetted in her child's abuse.

The district court did not abuse its discretion by admitting the night stick, color autopsy photographs and medical reports into evidence. The cumulative effect of alleged improprieties did not deny the appellant a fair trial.

The double durational departure in sentencing is justified by substantial and com-

pelling circumstances, including the child's age and vulnerability, the particular cruelty inflicted on the child as evidenced by the extent and nature of the injuries, the failure to obtain medical attention, and the possible psychological harm to the child's older sister.

AFFIRMED.