STATE of Minnesota, Respondent,

v.

William Edward DRIEMAN, Appellant.

No. C5–89–1625.

Supreme Court of Minnesota.

June 29, 1990.

John M. Stuart, State Public Defender, Michael F. Cromett, Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Alan Mitchell, St. Louis County Atty., Duluth, and Brian D. Simonson, Asst. County Atty., Hibbing, for respondent.

YETKA, Justice.

William Drieman, defendant, appeals from a conviction of murder in the first degree for causing the death of 3–year–old Corey McDougall while committing criminal sexual conduct and a conviction of murder in the second degree for causing the death of Corey McDougall while committing an assault. Defendant was convicted

after a jury trial in St. Louis County District Court. We affirm the conviction.

Laura McDougall, Corey McDougall's mother, has been twice married and divorced and has two daughters, Tina and Tanya, who were age 10 and 7 respectively at the time of trial. Corey McDougall's father is Jeffrey Spartz, but her relationship with him broke up when the latter moved to Texas. Laura McDougall started to see defendant in March of 1988. They spent five or six nights a week together.

Shortly after Laura McDougall started going with defendant, a number of people, including Laura McDougall, her mother and her two sisters, noticed that Corey McDougall had an unusual amount of bruises. When asked about the bruises, Laura McDougall said that she thought maybe Corey McDougall was hurting himself on his metal bed or falling down. Laura McDougall's sister who babysat the children four mornings a week noticed new bruises every Monday morning after Corey McDougall had spent the weekend at defendant's house in Chisholm. Two other acquaintances also noticed bruises appearing after Laura McDougall started dating defendant. One called social services.

Corey McDougall fractured his collarbone on Saturday, June 18, 1988, at the home of defendant's parents. Defendant's father testified that he saw Corey McDougall accidentally fall down the stairs. Defendant was upstairs when Corey McDougall fell. Laura McDougall noticed that Corey McDougall began bruising easily, stumbling and losing his appetite after he fractured his collarbone. She noticed two marks on Corey McDougall's penis 1½ to 2 weeks before he died. She became cautious and concerned about her children, her babysitter and even the dog, but not anyone else. At trial, she admitted that she testified to the grand jury that she initially suspected that defendant had caused the bruises.

About 1½ weeks after the broken collarbone, on a Sunday, Laura McDougall noticed that Corey McDougall had a sprained left wrist. Defendant had spent that weekend at Laura McDougall's apartment. Laura McDougall brought Corey McDougall to Dr. Gene Kishel later that evening. She told the doctor that Corey McDougall seemed to be bruising very easily. She asked him to perform a blood exam. According to Laura McDougall, Dr. Kishel said, "Boys will be boys." The doctor later denied saying this. The doctor put a splint on Corey McDougall's wrist.

Dr. Kishel then noticed over 20 small, fading bruises on Corey McDougall's face, upper body and neck. One appeared to be the shape of a hand. He had never noticed bruises on two other visits. He confronted Laura McDougall and notified St. Louis County Social Services. She said that Corey McDougall's sisters were mean to him and wedged him in the door. She testified at trial that she also saw Tina put a jump rope around Corey McDougall's throat and that both girls hit and pinched him. The doctor did not think this explained the bruises. Laura McDougall did not mention to the doctor that she was dating defendant. Because the handprint on Corey McDougall's cheek appeared small, the doctor mentioned the older sister in his report to social services.

In November 1988, school records indicated that Tina was 48 inches tall and weighed 50 pounds; Tanya, 42¼ inches and 42 pounds. People who babysat the children stated that, generally, the girls treated Corey McDougall nicely although they fought like normal siblings. In fact, one of Laura McDougall's sisters testified that the girls felt protective towards Corey McDougall.

Laura McDougall's mother and others stated that Corey McDougall banged his head on the floor when he had temper tantrums, causing bumps. No one ever saw defendant mistreat Corey McDougall.

Laura McDougall's sister testified that, on Tuesday, July 12, the day before his death, Corey McDougall looked ill. He pointed to his eye, which was bloodshot, and said "Hit." She asked who hit him. Corey McDougall answered "Bill," but he did not talk well. When he said "Bill" and "Bear," the defendant's dog's name, the words sounded the same.

Later on July 12, Laura McDougall and her children went over to defendant's house around 2:30 p.m. About 4:30 or 5:00 p.m., Laura McDougall and the girls went to the store to pick up some ingredients for spaghetti. They were gone for 30 to 45 minutes. Corey McDougall stayed with defendant in the house. He was the only person alone with Corey McDougall that afternoon. When Laura McDougall returned, she saw Corey McDougall waving at her from the door of the upstairs loft to the garage.

Laura McDougall then fixed dinner. When Corey McDougall started to eat, he turned pale and vomited on his plate. Laura McDougall said that, at this time, she noticed an abrasion on Corey McDougall's stomach. She also noticed that Corey McDougall had four or five bruises on his face as well as a popped blood vessel in one of his eyes.

Defendant removed the plate, dumped the contents, rinsed it off, put some more spaghetti on it and set it on the table by Corey McDougall. Corey McDougall just looked at the food and, when asked, indicated that he wanted to go to bed. Corey McDougall and the girls slept in the upstairs bedroom. Defendant brought him upstairs while Laura McDougall finished eating. Around 7:00 p.m., Corey McDougall vomited in bed. Laura McDougall and defendant thought that Corey McDougall had the flu so they remade the bed for the girls and laid Corey McDougall on the floor with a bucket beside him.

Before they went to bed at 11:00 p.m., according to Laura McDougall's trial testimony, she heard some thumping noises from upstairs. Defendant went upstairs to investigate. According to defendant, she testified, Corey was holding his stomach and pointing up to Tina, who was sitting on the edge of the bed and complaining that Corey was bothering her. Laura McDougall did not mention this incident in lengthy statements to the Hibbing Police Department, the Bureau of Criminal Apprehension or the grand jury.

In his first statement, defendant said that he and Laura McDougall checked on Corey McDougall and went to bed about 10:30 p.m.[1] He said that Corey McDougall was sleeping, but restless. He did not know if Corey McDougall woke up later in the night. In the second statement, defendant added that he and Laura McDougall heard some bumping around so he checked on Corey McDougall, who was tossing and, semi-asleep, complaining that his stomach hurt. Defendant said that the girls were asleep. He did not mention Corey McDougall holding his stomach and pointing at an alert Tina sitting on the edge of her bed as Laura McDougall testified.

Defendant explained Corey McDougall's injuries as follows: While Laura McDougall and the girls were at the store on July 12, defendant and Corey McDougall went to the upstairs of the garage and defendant fixed a window. Defendant claimed that, after he went down the stairs, Corey McDougall slid down the steps. A barbecue grill and a spare tire were at the bottom of the stairs. He didn't see Corey McDougall hit the ground. Corey McDougall slid down the garage stairs backwards and landed under the barbecue grill.

The next day, defendant claimed, he woke up at 6:15 a.m., asked Corey McDougall if he had to go "potty," and walked downstairs with him to the bathroom. Corey McDougall was acting "like he was dizzy or weak." He noticed that Corey McDougall's stomach was bloated and hard. Defendant said that Corey McDougall sat down on the toilet while defendant took a shower. When defendant got out of the shower, he said, he found Corey McDougall lying on the floor. He could see Corey McDougall's heart beat in his left upper chest. He blew in Corey McDougall's mouth and yelled to Laura McDougall to call the ambulance because Corey McDougall wasn't breathing.

The first thing Laura McDougall did was check Corey McDougall's pulse. There was none; his wrist was cool. She called the ambulance immediately. She said that he was pale, his head was enlarged and

---

1. The jury listened to tapes of three interviews of defendant.

"his chest seemed kind of weird too like the blood veins were popping up in his shoulder area." The ambulance arrived within 3–5 minutes. Defendant told Laura McDougall that Corey McDougall had fallen down the stairs the day before.

Three emergency medical technicians who responded to the call for a baby not breathing, including the emergency medical technician who handled Corey McDougall the most, found him cool to the touch and rigid. Another of the emergency medical technicians told police that he found Corey McDougall warm and not rigid, but suggested that his assessment may not have been accurate because of his cold hands and his brief handling of Corey McDougall. One other emergency medical technician also thought that Corey McDougall was not cold or rigid. Some of the emergency medical technicians noticed that Corey McDougall did not "pink up" as patients usually do with CPR.

At the emergency room at 7:15 or 7:20 a.m., the nurse anesthetist could not tilt Corey McDougall's head back far enough to intubate him due to the stiffness of his neck and jaw. Other nurses and doctors in the emergency room noticed that Corey McDougall was cool and stiff. A rectal temperature taken a little after 8:00 a.m. registered below 94 degrees Fahrenheit, the lowest temperature on the thermometer.

The emergency medical technicians and the staff in the emergency room noticed that Corey McDougall was gray and bruised. They also did not believe that Corey McDougall was alive at 6:15 a.m. as defendant claimed. Thus, the doctors who worked on Corey McDougall decided to call the police.

Dr. Thomas Uncini, a pathologist who conducted the autopsy of Corey McDougall, noticed that he was cool and extremely rigid. He counted 60 bruises, 10 or 11 abrasions, and about 5 small lacerations. He estimated that most of the bruises occurred within less than 24 hours, admitting that it is difficult for pathologists to ascertain when bruises were inflicted.

Dr. Uncini described Corey McDougall's external injuries with the aid of photographs of his body. It is unusual, he testified, for a fall to cause bruises on the "low parts" of the body such as the neck, the inside of the legs, and the back where Corey McDougall had bruises. In other words, one who falls down a flight of stairs will hit the "high points" such as the tips of the shoulders and the elbows.

Corey McDougall had a laceration and bruise on the end of his penis. Dr. Uncini thought that it could have been caused by a pinch. Although a zipper may have caused the laceration, it probably did not cause the bruising.[2] Corey McDougall also had small cuts or tears on his anus. A stretching injury would cause this kind of break in the anal area. The injury is consistent with insertion of a dull, blunt or rounded object such as the end of a screwdriver, a thumb, a finger, or slight penetration with a penis. There was no evidence of sperm or semen. Constipation can cause small tears, but the doctor thought it unlikely in this case. Normal wiping by an adult would not cause the cuts.

Dr. Uncini concluded that the small circular mark on Corey McDougall's back was a burn from a cigarette or a small cigar. Other consulting pathologists, however, could not be certain the mark was a burn. Corey McDougall's abdomen was hard because over one-third of his blood had drained into that area. Five to 7 days earlier, a blow had injured Corey McDougall's thymus gland, an organ in the middle of the chest that is very large in children.

Dr. Uncini found lacerations in the liver and in the duodenum, a part of the intestines. One blow could have injured both organs. Only a severe, violent force would cause these injuries, i.e., a blow forceful enough to strike the spinal cord. Because there were no penetrating injuries to the abdomen or back, the doctor concluded that a blunt object of about 4 or 5 inches inflicted the wounds. This would be consistent

2. On the day before Corey McDougall died, Laura McDougall testified, Corey McDougall wore shorts with an elastic waistband. He had not worn shorts with a zipper for several weeks.

with a fist or a foot. He did not think that a 6- or 9-year-old girl could have used sufficient force to cause this type of injury; neither did Dr. Janice Ophoven, a pediatric pathologist. However, Dr. Uncini said that a 9-year-old jumping off a bed and landing with the heels on the boy could possibly cause the injury. Both doctors also concluded that falling on the objects at the bottom of defendant's garage stairs would not have caused the injuries.

Corey McDougall died from the injuries to his liver and bled to death. A child receiving those injuries would probably not have been able to walk for a short time, may have recovered enough to walk a little, but would have gotten visibly sicker and sicker until he died. Vomiting is consistent with the injury.

Dr. Uncini conservatively estimated that Corey McDougall would have been dead by 5:00 a.m. at the latest. He could have died much earlier. Dr. Ophoven agreed.

Dr. Ophoven consults with a number of agencies in analyzing patterns of injuries and history suggesting child abuse or neglect. She used many of the photographs to illustrate her testimony. The injuries to Corey McDougall's ears, eye, lip, arm and hands are typically found on victims of child abuse. She also testified that Corey McDougall's penis appeared bruised, an injury often seen as a result of pinching. The injuries to the rectum looked like a "classic" example of a penetrating injury typical of sexual abuse.

The jury deliberated for 5 hours before returning a verdict of guilty of murder in the first and second degree. The judge sentenced defendant to life imprisonment.

The defendant raises the following issues as grounds for reversal:

1. Did the trial court's failure to grant defendant's challenges for cause and motions to change venue deny defendant a fair and impartial jury?

2. Did defendant waive his right to challenge the prosecutor's statements to the grand jury by failing to raise the issue in his motion to dismiss the indictment?

3. Did the trial court abuse its discretion by admitting *Spreigl* evidence of an assault committed by defendant 9½ years before Corey McDougall's death?

4. Did the trial court abuse its discretion by admitting photographs of Corey McDougall's body?

5. Did the evidence support convictions for murder in the first degree and murder in the second degree?

■ 1. Defendant argues that he was denied his right to an impartial trial because the trial court denied certain defense challenges for cause and his motion to change the venue from Hibbing to Duluth. The test is whether the publicity created a reasonable likelihood that a fair trial could not be had without a change of venue. *State v. Beier*, 263 N.W.2d 622, 626 (Minn. 1978). The trial court has wide discretion in determining whether a change of venue should be granted, and this court will not reverse the trial court's determination unless there has been a clear abuse of discretion. *State v. Kinsky*, 348 N.W.2d 319, 323 (Minn.1984). Defendant claims that pretrial publicity around the Hibbing area made it impossible to try defendant fairly and impartially there. The state responds that the pretrial publicity was relatively minimal, primarily factual, and occurred long before trial. Moreover, most of the media attention was in Duluth where defendant sought to be tried. We agree with the trial court in denying the motion to change venue.

■ "In an appeal based on juror bias, an appellant must show that the challenged juror was subject to challenge for cause, that actual prejudice resulted from the failure to dismiss, and that appropriate objection was made by appellant." *State v. Stufflebean*, 329 N.W.2d 314, 317 (Minn. 1983). The defendant must do more than elicit an admission from a potential juror that he has been exposed to pretrial publicity. *Beier*, 263 N.W.2d at 626. The test is whether a prospective juror can set aside his or her impression or opinion and render an impartial verdict. *Kinsky*, 348 N.W.2d at 323. The trial court is in the best posi-

tion to determine whether jurors can be impartial because it hears the prospective jurors' testimony and observes their demeanor. *See Beier*, 263 N.W.2d at 627. Thus, if jurors indicate their intention to set aside any preconceived notions and demonstrate to the satisfaction of the trial judge that they are able to do so, this court will not lightly substitute its own judgment. *State v. Howard*, 324 N.W.2d 216, 220 (Minn.1982).

■ None of the jurors defendant challenged for cause actually sat on the case. Louis Kochevar and Leonard Belak, two of the jurors defendant challenged, served as alternate jurors. Defendant challenged Kochevar because he had read, heard on TV and talked to people about the case. Kochevar stated to the judge that he hadn't formed any opinions about the case, that "as far as I'm concerned it's like a fresh start." Defendant challenged Belak because he had heard about the case from other jurors. Belak had heard about the case on the radio, but stated that he had no opinion because "I don't even know really what happened, to be honest with you. Just that little bit on the radio." Although he admitted that, because of his 2–year–old granddaughter, Corey McDougall's age might affect him, he told the judge that he could set aside these feelings to reach a fair conclusion.

Defendant accepted the 13 other jurors without challenge. Of the 15 jurors chosen, 3 had never heard about the case, 9 had heard about the case, but had formed no opinions, and 3 had some preconceived ideas based on what they had heard, but testified that they could set them aside and presume defendant innocent until proven guilty. Thus, the trial court did not abuse its discretion in denying defendant's challenges for cause where the challenged jurors convinced the trial court that they could set aside any preconceived notions and render a fair verdict.

■ 2. Objections to an indictment must be made by motion. Minn.R.Crim.P. 17.06. Such a motion "shall include all defenses, objections, issues and requests then available to the moving party. Failure to include any of them in the motion constitutes a waiver thereof, but the court for good cause shown may grant relief from the waiver." Minn.R.Crim.P. 10.03.

■ In his motion to dismiss the indictment and accompanying memorandum, defendant only claimed insufficient evidence. Defendant did not appeal the trial court's denial of this motion, but now challenges the prosecutor's conduct before the grand jury in making an isolated misstatement regarding the grand jury's "obligation to indict" upon a finding of probable cause. Defendant also claims that the prosecutor erred by repeatedly mentioning the second-degree murder charges against defendant. Because defendant did not raise these objections in his original motion challenging the indictment and because he did not show cause for granting relief from this waiver, this court need not consider this challenge to the indictment.[3]

■ 3. The trial court, over objection, admitted evidence of an assault defendant committed as part of a group of prisoners against another prisoner 9½ years before Corey McDougall died. This court will not disturb the trial court's decision to admit *Spreigl* evidence absent a clear abuse of discretion. *State v. Slowinski*, 450 N.W.2d 107, 113 (Minn.1990). Rule 404 of the Minnesota Rules of Evidence provides:

**3.** If we were to consider these issues, we would probably find the indictment valid. Because a presumption of regularity attaches to a grand jury indictment, courts will rarely invalidate an indictment. *State v. Scruggs*, 421 N.W.2d 707, 717 (Minn.1988). This is especially true where, as here, the appellant challenges the indictment after being found guilty in a fair trial. *Id.* Erroneous instructions will not invalidate an indictment absent a showing of prejudice. *State v. Inthavong*, 402 N.W.2d 799 (Minn.1987); that

is, "where the grand jury instructions are so egregiously misleading or deficient that the fundamental integrity of the indictment process itself is compromised." *Id.* Here, unlike the conduct in *Inthavong* where the court's thrice deliberately misstated probable cause instructions were not diluted by the instructions as a whole, the prosecutor's statements did not compromise the grand jury process so as to invalidate the indictment.

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of * * * identity, or absence of mistake or accident.

Pursuant to *State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965), and its progeny, evidence relevant under this rule is not admissible unless: the state gives notice of intent to introduce the evidence and specifies the evidentiary exception under which it seeks to admit the evidence; evidence establishing identity also relates to the time, place or modus operandi of the offense charged; the evidence of past crimes is necessary to the state's burden of proof; the evidence of the prior acts is clear and convincing; and the court gives appropriate jury instructions as to the purpose of the evidence. *State v. Hannuksela,* 452 N.W.2d 668, 678 (Minn.1990); *State v. Matteson,* 287 N.W.2d 408, 411 (Minn. 1979). Moreover, the probative value of the evidence must outweigh the potential for unfair prejudice. *State v. Robinson,* 427 N.W.2d 217, 227 (Minn.1988).

■ The trial court addressed these requirements and admitted the evidence:

It is apparent to the Court from the record that adequate notice has been given here * * * that the offered evidence is clear and convincing and in fact involves prior convictions in each case. The real question boils down to whether the probative value outweighs the prejudice to the defendant, and that has a lot to do with the strength of the state's case. * * * the Court is of the view that plan, identity and absence of mistake as well as under case law pattern of similar conduct involving vulnerable victims are valid purposes for this evidence to be admitted. Much of the state's case at this point in time is circumstantial and much of it is going to relate to the jury's view of the credibility of the evidence * * *.

The man whom defendant and other inmates beat suffers from muscular dystrophy and blindness in his right eye. He was 6 feet tall and weighed 110 pounds when they beat him. The record supports finding this evidence relevant to proving modus operandi: Like Corey McDougall, this man was vulnerable. Like Corey McDougall, he too was burned by cigarettes, sexually assaulted, and suffered bruises and injuries to ears, eyes and internal organs. Moreover, in light of defendant's position that an accident caused Corey McDougall's death or, as Laura McDougall suggested, his older sisters abused him, the evidence was relevant to prove identity or absence of accident.

■ Defendant asserts that the conviction for aggravated assault of his fellow inmate was not relevant and material because he committed the assault 9½ years earlier. However, this court has often discounted such passage of time when a defendant was incarcerated during a large segment of that time. *State v. Norris,* 428 N.W.2d 61, 70 (Minn.1988) (8–year–old offense admissible where defendant incarcerated for 6 years); *State v. Crocker,* 409 N.W.2d 840, 843 (Minn.1987) (9–year–old offense admissible where defendant incarcerated for most of time). In addition, this court will uphold admissibility notwithstanding a lack of proximity in time or place if the relevance of the evidence is otherwise clear. *State v. DeBaere,* 356 N.W.2d 301, 305 (Minn.1984).

■ Here, defendant was incarcerated for over 5 years during the 9½ years between his assault of the inmate and Corey McDougall's death. Further, as discussed above, its relevance is otherwise clear to show modus operandi, identity and absence of accident. Defendant also asserts that this evidence is not relevant because there is no similarity between defendant's relationship with an adult prison mate and Corey McDougall, a child in his care. Evidence of a past assault, however, is not necessarily irrelevant if the relationship between the present defendant and victim is not parallel to the past assault. Finally, the court correctly warned the jury to consider the past act only as it related to whether defendant caused Corey McDougall's death and not to convict based on the past act. Accordingly, we find that the

trial court did not abuse its discretion in admitting the evidence of this past assault.

4. Defendant claims that the trial court committed reversible error by admitting into evidence unnecessary and cumulative photographs of Corey McDougall. The admission of photographs is in the discretion of the trial judge. *State v. Daniels,* 361 N.W.2d 819, 828 (Minn.1985). *State v. DeZeler,* 230 Minn. 39, 41 N.W.2d 313 (1950), established the standard for admitting photographs:

> Photographs are admissible as competent evidence where they *accurately* portray anything which it is competent for a witness to describe in words, or where they are helpful as an aid to a verbal description of objects and conditions, provided they are relevant to some material issue; and they are not rendered inadmissible merely because they vividly bring to jurors the details of a shocking crime or incidentally tend to arouse passion or prejudice.

*Id.* 230 Minn. at 46–47, 41 N.W.2d at 319 (emphasis in original). This court has reaffirmed this standard in a number of cases. *E.g., State v. Alton,* 432 N.W.2d 754, 757–58 (Minn.1988); *State v. Durfee,* 322 N.W.2d 778, 785–86 (Minn.1982).

The facts in *Durfee* resemble this case. In *Durfee,* a defendant accused of first-degree assault on his girlfriend's 13–month–old daughter claimed that a fall from the child's crib left her bruised and partially paralyzed. Photographs of the child's injuries were admissible to provide demonstrable, visual evidence of the cause and source of the child's bodily harm. *Durfee,* 322 N.W.2d at 785–86 (Minn.1982).

In *Alton,* this court held that six photographs of the autopsy of the victim were relevant and not cumulative because they helped illustrate testimony establishing a pattern of bullet shots. *Alton,* 432 N.W.2d at 758. In another case, we found 18 slides of an autopsy showing wounds from different angles admissible to illustrate the testimony of a pathologist. *State v. Sanders,* 376 N.W.2d 196 (Minn.1985).

Here, like the defendant in *Durfee,* defendant claims that Corey McDougall sustained his injuries from an accidental tumble down the stairs. Moreover, Laura McDougall's testimony implicates her daughters as possible sources of the injuries. Thus, here, the pictures are relevant to demonstrate the cause and source of Corey McDougall's death.

Many of the pictures seem repetitive as defendant notes. These pictures, though very similar, show different angles and distances. Sometimes a ruler or hair obscures a bruise or abrasion visible in a similar picture taken without the obstacle. These pictures illustrated the pathologists' testimony and, as in *Alton* and *Sanders,* were not prejudicially cumulative. Accordingly, we find that the trial court did not abuse its discretion in admitting the photographs.

5. Defendant claims that the evidence did not support a conviction. In these cases, this court painstakingly reviews the record to determine whether the evidence is sufficient to permit the jury to reach the conclusion it did. *State v. Ellingson,* 283 Minn. 208, 211, 167 N.W.2d 55, 57 (1969). We view the evidence in the light most favorable to the verdict and assume that the jury disbelieved any testimony conflicting with the result reached. *State v. Oevering,* 268 N.W.2d 68, 71 (Minn.1978). Convictions based on circumstantial evidence will be sustained only when the reasonable inferences from such evidence are consistent with defendant's guilt and inconsistent with any rational hypothesis except that of guilt. *State v. Race,* 383 N.W.2d 656, 662 (Minn.1986).

A review of the record as summarized in the fact section of this opinion reveals that reasonable inferences from the evidence correspond only with a finding of guilt. In sum, friends and relatives testified as to bruises and injuries appearing on Corey McDougall after Laura McDougall started dating defendant. Defendant was the only person alone with Corey McDougall immediately before he died from his injuries. Emergency medical technicians and emergency room staff did not believe defendant's claim that Corey McDougall

was alive at 6:15 a.m. Pathologists found that Corey McDougall had died at 5:00 a.m. or earlier as a result of a powerful blow inflicted by a blunt object, that a person had injured Corey McDougall's penis and anus, and that Corey McDougall's injuries were not consistent with a fall down the stairs. We find this evidence sufficient to support convictions for murder in the first and second degree.

For all of the aforesaid reasons, the trial court's rulings are affirmed and the convictions sustained.