STATE of Minnesota, Petitioner,
Appellant,

v.

Michael Allen HATFIELD, Respondent.

No. C9–00–1183.

Supreme Court of Minnesota.

Feb. 21, 2002.

Mike Hatch, Minnesota Attorney General, Natalie E. Hudson, Assistant Attorney General, St. Paul, Terry W. Viesselman, Martin County Attorney, Fairmont, Appellant's Attorney(s).

John M. Stuart, Minnesota State Public Defender, Mary R. Vasaly, Special Assistant State Public Defender, Minneapolis, Respondent's Attorney(s).

## OPINION

BLATZ, Chief Justice.

Respondent Michael Allen Hatfield was convicted of one count of conspiracy to manufacture methamphetamine, Minn. Stat. §§ 152.096, subd. 1, and 152.021, subd. 2a & 3a (2000), one count of possession of methamphetamine, Minn.Stat. § 152.025, subd. 2(1) (2000), one count of possession of drug paraphernalia, Minn. Stat. § 152.092 (2000), and one count of child endangerment, Minn.Stat. § 609.378, subd. 1(b)(1) (2000). He appealed to the court of appeals from his convictions for child endangerment and conspiracy to manufacture methamphetamine. The court of appeals affirmed the child-endangerment conviction, but reversed the conspiracy conviction, holding that there was no evidence presented to the jury establishing that Hatfield had entered into an agreement with his alleged co-conspirator. *State v. Hatfield*, 627 N.W.2d 715, 719–20 (Minn.App.2001). We granted the state's petition for further review and now affirm.

On December 3, 1999, at around 11 p.m., Bobbie Nowak drove Anthony Theobald, her boyfriend, to a house in Fairmont, Minnesota, where Michael Hatfield and his family were temporarily staying. The house was owned by Hatfield's cousin, David Stedman, who had been working out of town for most of the week that the Hatfields stayed in his home. Hatfield had called Theobald earlier that evening and asked him to pick up and bring to him a cooler and propane tank that were in Nowak's neighbor's garage. Theobald did as asked, putting the items in the trunk of Nowak's car before he and Nowak drove to Stedman's house to meet Hatfield.

That same evening, Fairmont police officers had been contacted by the Thomas County, Kansas sheriff's department. At about 11:00 p.m., a Fairmont officer spoke with a Thomas County deputy who requested that Hatfield be arrested under a warrant issued in Thomas County. The Thomas County deputy informed the Fairmont officer that Hatfield was probably staying with Stedman. Based on this information, several Fairmont police officers went to Stedman's house. When the officers arrived, Hatfield was carrying a red cooler from Nowak's car to the garage. A second group of Fairmont police officers, arriving from the rear, saw Hatfield entering the garage through the service entrance. Hatfield soon emerged from the front door of the house and identified himself to officers located at the front of the house who were questioning Theobald and Nowak. He was informed of the warrant for his arrest and taken into custody. Officers searched Hatfield incident to arrest and seized drug paraphernalia, approximately $447 in cash, and razor blades coated with white, powdery residue. Hatfield later told an officer that he received the paraphernalia from "a kid that just got busted for this stuff [and] * * * threw it [my] way."

The officers who saw Hatfield enter the garage detected a smell emanating from the open service entrance. One officer, Sergeant Dale Ellis, noticed a much stronger smell inside the garage. He testified that the odor caused a "metallic taste," a stinging sensation in his eyes, and took his breath away. Sergeant Ellis then entered the house, where he could smell the same odor as that coming from the garage, and found five children, four of whom were Hatfield's. Because Sergeant Ellis believed the odor was caused by anhydrous ammonia, an ingredient used to manufacture methamphetamine, he radioed for Agent James Kotewa, a Fairmont police officer assigned to the Minnesota River Valley Drug Task Force, for additional assistance. Sergeant Ellis also telephoned the Martin County Human Services Department for assistance in removing the children from the house.

Stedman, the owner of the house, returned around midnight and consented to a search of the property. During the search, Officer Ellis and Agent Kotewa found what they believed were the requisite components of an anhydrous-ammonia methamphetamine laboratory.

Hatfield was charged with conspiracy to manufacture methamphetamine, possession of methamphetamine, possession of drug paraphernalia, and child endangerment. At trial, there was conflicting testimony about the presence of the smell of anhydrous ammonia. Officer Ellis, Agent Kotewa, Officer Kevin Walser, and Officer Michael Hunter testified that they smelled ammonia coming from the garage. Additionally, several officers testified that they smelled an odor, similar to the one in the garage, upon entering the house. In contrast, both Hatfield's wife and Stedman testified that they did not notice an odor in the house.

Agent Kotewa testified that the propane tank had alterations to the handle and a blue-green discoloration around the nozzle, which were typical signs of a propane tank used to transport anhydrous ammonia. He also testified that the red cooler held five mason jars that contained precipitation. Based on the strong smell, Agent Kotewa believed the precipitation to be anhydrous ammonia. Because Agent Kotewa was concerned about the risks posed by the suspected anhydrous ammonia, he directed that the jars and the propane tank be destroyed without being tested.

The state compelled Nowak and Theobald to testify. Nowak testified that she did not bring anything to Hatfield's temporary residence, but stated that Theobald brought a small tank she thought was used for a gas grill. Theobald testified that Hatfield asked him to bring over a cooler and a "propane tank for the grill." He also testified that he did not know the contents of the propane tank and denied discussing any other topic with Hatfield aside from "running out to the Legion and having a drink." When asked who carried the propane tank and red cooler to the garage, Theobald responded that he may have carried one but he was not sure because "at that point, I didn't—you know, I didn't know if there was a significance." Both Nowak and Theobald testified that they did not smell any odor emanating from the propane tank or the trunk of Nowak's car.

While the state did not present direct evidence showing a criminal agreement between Hatfield and Theobald, Agent Kotewa was allowed to testify, over Hatfield's objection, that there was an "on-going criminal investigation" and that he believed Theobald was involved with Hatfield and would soon be arrested. Agent Kotewa did not explicitly state the basis for such an arrest, but he implied that it involved the same circumstances giving rise to the charges against Hatfield.[1]

Hatfield was convicted of one count each of conspiracy to manufacture methamphetamine, possession of methamphetamine, possession of drug paraphernalia, and child endangerment. He appealed to the court of appeals from the conspiracy and child endangerment convictions, challenging the sufficiency of the evidence supporting each verdict. The court of appeals affirmed the child endangerment conviction but concluded that there was "insufficient evidence in the record from which the jury could reasonably infer that Hatfield entered into an actual agreement with anyone for the purpose of manufacturing methamphetamine." *State v. Hatfield*, 627 N.W.2d 715, 719 (Minn.App.2001).

 In reviewing a sufficiency of the evidence claim, we are limited to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach their verdict. *State v. Webb*, 440 N.W.2d

---

1. During the state's case in chief, Agent Kotewa was asked about Theobald:

Q. * * * [W]as Anthony Theobald present at the scene?
A. I remember seeing—yes. I remember seeing Tony.
Q. Okay. And was Anthony Theobald arrested that evening?
A. No, he was not.
Q. Why wasn't he arrested that night.

A. At that point, there was an on-going inves—Well, at that point, I did not see the probable cause to arrest him. I did not have all the facts at that point.
Q. And why hasn't he been arrested since that time?
A. I anticipate him getting arrested—on-going criminal investigation.
Q. You believe Anthony Theobald was involved with Michael Hatfield?
A. Yes.

426, 430 (Minn.1989). When weighing the sufficiency of circumstantial evidence, we give it as much weight as any other kind of evidence, as long as the circumstances are both consistent with the hypothesis that the defendant is guilty and inconsistent with any rational hypothesis except that of guilt. *State v. Walen,* 563 N.W.2d 742, 750 (Minn.1997). Thus, the circumstantial evidence must " 'form a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt.' " *Webb,* 440 N.W.2d at 430 (quoting *State v. Wahlberg,* 296 N.W.2d 408, 411 (Minn.1980)).

A conspiracy exists when someone "conspires with another to commit a crime and in furtherance of the conspiracy one or more of the parties does some overt act in furtherance of such conspiracy * * *." Minn.Stat. § 609.175 (2000). In this case the jury found that Hatfield conspired with another to manufacture methamphetamine. On appeal, Hatfield argued that there was insufficient evidence of an agreement.

■ Proof of a formal agreement to commit a crime is not required for a conspiracy conviction. *State v. Burns,* 215 Minn. 182, 189, 9 N.W.2d 518, 521 (1943). In addition, the agreement required for a conspiracy need not be proved through evidence of a subjective meeting of the minds, but must be shown by evidence that objectively indicates an agreement. *See State v. St. Christopher,* 305 Minn. 226, 230–35, 232 N.W.2d 798, 801–03 (1975).

■ The state acknowledges that proof of the agreement in this case was circumstantial. To successfully challenge a conviction based solely on circumstantial evidence, the defendant must establish that the evidence in the record and the reasonable inferences that could be drawn therefrom are consistent with a rational hypothesis other than just the defendant's guilt. *State v. Steinbuch,* 514 N.W.2d 793, 798–99 (Minn.1994); *see also Walen,* 563 N.W.2d at 749–50. Hatfield's theory is that Theobald, as he testified, did not know that anhydrous ammonia was in either the propane tank or the red cooler, and therefore his act of bringing the tank and cooler to Hatfield does not indicate an agreement to manufacture methamphetamine.

In contrast, the state points to three pieces of evidence that could allow the jury to reasonably conclude that Hatfield and Theobald entered into a criminal agreement: evidence that Theobald delivered the propane tank and red cooler to Hatfield at Hatfield's request; testimony that Theobald was under investigation for "drug-related activities"; and testimony that Hatfield associated with known drug users. This evidence, taken in the light most favorable to the verdict, is consistent with a rational hypothesis other than guilt, and not only consistent with Hatfield's guilt.

■ The state claims that the evidence shows that Theobald knew of the contents of the tank and cooler and argues that a reasonable inference from that knowledge is that Hatfield and Theobald agreed to manufacture methamphetamine. The state must overcome the principle that consorting with an innocent courier does not constitute an agreement necessary for a conspiracy. *See Burns,* 215 Minn. at 188–89, 9 N.W.2d at 521 (quoting *United States v. Falcone,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940): "Those having no knowledge of the conspiracy are not conspirators * * * and one who without more furnishes supplies * * * is not guilty of conspiracy even though his sale may have furthered the object of a conspiracy * * *.") (first omission in *Burns*).

■ We note first that there is no direct evidence that Theobald knew that the tank and cooler contained anhydrous ammonia.[2] Moreover, Theobald's *knowledge* of what was in the tank and cooler is simply not particularly probative of an *agreement* to manufacture drugs. That is, Theobald's knowledge of what was in the tank does not make it significantly more likely that Hatfield agreed with him to manufacture methamphetamine. In other cases, an inference of agreement from knowledge may be reasonable. However in this case—where there was no evidence of a common plan, concerted conduct, or prior involvement with the alleged co-conspirator—any inference of an agreement from knowledge, standing alone, is simply not reasonable. We emphasize that the focus of the inquiry is properly on whether there was objective evidence that *Hatfield* agreed with another to produce methamphetamine. *See* Minn.Stat. § 609.175. For purposes of assessing the sufficiency of this circumstantial evidence, Theobald's knowledge of what was in the tank and red cooler does not "form a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt." *Wahlberg*, 296 N.W.2d at 411.

■ The state also argues that Agent Kotewa's statement that Theobald was under investigation for criminal activities is evidence of an agreement between Hatfield and Theobald to manufacture methamphetamine. Over Hatfield's objection Kotewa testified that he believed Theobald would be arrested as a result of an ongoing criminal investigation. The officer also testified that he believed Theobald was "involved" with Hatfield. While the admissibility of such evidence is questionable in the first instance, that issue is not before us. The evidence indicates only that Theobald *might be arrested* for criminal activities—the very "activities" that give rise to this appeal. As such, the evidence says nothing about an agreement with Hatfield. In addition, the officer was not asked the basis for his belief that Theobald and Hatfield were "involved," and mere involvement again does not establish an agreement to manufacture methamphetamine. Thus, taking the evidence in the light most favorable to the verdict, the evidence was insufficient to permit the jury to reach a guilty verdict on the conspiracy charge.

■ Finally, the state argues that the agreement was supported by the presence of drug paraphernalia and methamphetamine on Hatfield's person and in Nowak's trunk, and by Hatfield's statement that he received the drugs from another methamphetamine user. With respect to the conspiracy charge, this evidence goes to Hatfield's knowledge and perhaps an overt act, but says nothing about an agreement with another to manufacture methamphetamine. Thus, the evidence may have supported Hatfield's convictions for possession, but does not lead to the conclusion that there was an agreement with another to manufacture methamphetamine.

To support a conspiracy conviction, the evidence must objectively indicate that at least one person conspired with another to commit a crime and that one or more of those persons performed an overt act in furtherance of the agreement. Minn.Stat.

---

2. The state claims Theobald must have known of the contents based on the apparent odor of anhydrous ammonia. However, there was no evidence to indicate that Theobald actually recognized anything suspect about the items, nor was there evidence that an ordinary person would have inferred from the smell of anhydrous ammonia that methamphetamine was being made.

§ 609.175. The conduct proved by the state established at most only that Theobald brought a propane tank and cooler to Hatfield at Hatfield's request, and that Hatfield possessed drugs and drug paraphernalia. The evidence does not " 'form a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt.' " *Webb*, 440 N.W.2d at 430 (quoting *Wahlberg*, 296 N.W.2d at 411). Specifically, there was simply insufficient evidence, circumstantial or direct, of an agreement between Hatfield and another to manufacture methamphetamine. Therefore, the conspiracy conviction was properly reversed.

Affirmed.