**STATE of Minnesota, Respondent,**

v.

**Michael Patrick ASFELD, Appellant.**

**No. C3–02–633.**

Supreme Court of Minnesota.

June 12, 2003.

Joseph S. Friedberg, Lisa Lodin Peralta, Uptown Business Center, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, State of Minnesota, Kelly O'Neill Moller, Thomas R. Ragatz, Assistant Attorney General, St. Paul, MN, Roger S. Van Heel, Stearns County Attorney, St. Cloud, MN, for Respondent.

## OPINION

PAUL H. ANDERSON, Justice.

Appellant Michael Patrick Asfeld was indicted for four counts of murder in connection with the death of his infant son Dominick. The four murder counts were murder in the first degree (premeditation), murder in the first degree (child abuse), murder in the first degree (domestic abuse), and murder in the second degree. Asfeld was also indicted for violating the terms of an order for protection that had been issued after he admitted shaking Dominick. A jury found Asfeld guilty of all four murder counts, and he was sentenced to life imprisonment for first-degree child abuse murder. Asfeld appeals the conviction on the following grounds: the district court improperly applied the domestic abuse murder statute; the court erred in admitting *Spreigl* evidence of his prior incidents of violence; there was insufficient evidence to support his conviction; and he received ineffective assistance of counsel. We affirm the conviction.

Michael Patrick Asfeld began dating Wendy Ruprecht in 1995, when he was nineteen and she was sixteen. A year later, they moved into Ruprecht's parents' home, and then into a home of their own. After a tumultuous period during which the couple broke up and reunited, Ruprecht became pregnant, and on August 9, 1999, they had a son, Dominick. At this time, they were living together in Cold Spring, Minnesota.

On December 15, 1999, Ruprecht went to work leaving Asfeld at home with Dominick who had been kept out of daycare because he had a cold. Ruprecht called home at noon to say she was sick and coming home. At that time, Asfeld told her that Dominick seemed sick, had eaten very little, and had thrown up. When Ruprecht got home, she called Dominick's doctor, Dr. Timothy Ebel, and then she and Asfeld took Dominick to see Ebel. Ebel testified that he saw Dominick at around 5:00 p.m. that same day and did a physical exam, which included drawing blood and taking a chest x-ray. Ebel's notes from that exam described Dominick as "alert," "nontoxic," and "in no acute distress." Ebel diagnosed Dominick with fever, cough, and probable pneumonia and prescribed antibiotics and Tylenol. Ebel later testified that during the exam, Dominick seemed "a little off," his eyes did not appear to be tracking right, and he did not show any signs of discomfort or flinching when the shots were given.

Ruprecht testified that when they returned home, Dominick's behavior did not improve significantly. Between 7:00 and 8:00 p.m., Asfeld left the house and when he returned, Dominick continued to be in distress: he was whimpering and had little reaction to his bath. Around 10:00 p.m., Dominick started seizing. Asfeld and Ruprecht then took Dominick to the hospital emergency room. The emergency room doctors testified that Dominick exhibited classic signs of shaken baby syndrome, and a child abuse expert described these signs as seizures, a low sodium level, a subdural hematoma, retinal hemorrhage, and fractures. Dominick was admitted to the hospital and treated for his injuries until he was released into foster care on December 30, 1999. Dominick's case was reported to the Stearns County authorities.

After Dominick was released into foster care, investigators and social workers told Asfeld and Ruprecht that Dominick would not be released from foster care and their parental rights could be terminated if no one admitted to the alleged abuse. Asfeld and Ruprecht agreed that Asfeld would say that he had shaken Dominick so that Ruprecht would be able to regain custody. Ruprecht and Asfeld both told their families that his admission to the shaking was part of a plan to regain custody and on January 25, 2000, Asfeld told investigators that he had shaken Dominick. Asfeld was subsequently charged with first-degree assault and malicious punishment of a child and a Children In Need of Protective Services (CHIPS) case was filed. At the May CHIPS hearing, Asfeld recanted his confession. An Order For Protection (OFP) was issued nonetheless to keep Asfeld from having unsupervised contact with Dominick and Asfeld reluctantly moved into his parents' home.

Dominick was still severely injured when he was released from the hospital into foster care: he had a shunt in his head, blurred vision, need for therapy, and was required to attend almost daily medical appointments. Ruprecht attended nearly all of Dominick's appointments, and Asfeld participated in a few as well. While in foster care, Dominick received both physical and occupational therapy and his condition improved significantly. Asfeld had contact with Dominick during this healing period, and witnesses later described the interaction as being positive. In March 2000, Dominick returned to live with Ruprecht.

About six months later, on October 10, 2000, Asfeld spent the day combining. He finished working around 10:00 p.m. and drove to Ruprecht's house. He arrived at about 10:30, entered without knocking, read through his mail, and went to the living room. Ruprecht was asleep on the couch and when she woke up they spoke briefly. She then went to the bedroom where she went back to sleep. Asfeld testified that he watched television for a while and then left, without saying goodbye to Ruprecht or checking on Dominick, who was asleep in his crib in another room. Asfeld arrived at his parents' home between 11:00 and 11:30 p.m., and family members testified that Asfeld appeared normal and calm when he arrived home.

On the morning of October 11, Ruprecht woke with her alarm and went to check on Dominick. He was not breathing and was cold to the touch. She called 911 and the Stearns County Sheriff sergeant who responded to the call found Dominick lying on his back in his crib, clearly dead. There was a pattern of abrasion on Dominick's cheeks that the pathologist who performed the autopsy later declared were consistent with someone placing a hand or a blanket over the child's nose and mouth.

Witnesses who had seen Dominick on October 10 testified that those abrasions had not been present when they had seen him. A Stearns County detective spoke with Ruprecht that morning and was told that Asfeld had come over the previous night at around 10:00 to pick up his mail, that he had not seen Dominick, who was asleep, and that Ruprecht had checked on Dominick at 11:00 and he was asleep on his stomach. The detective took the mattress, sheets, bumper pad, and blanket from Dominick's crib and she observed no traces of dirt or foreign objects.

Asfeld moved back in with Ruprecht shortly after Dominick's death. Their relationship soon deteriorated and Ruprecht eventually moved out of the house about two months after Dominick's death.

Nearly five months after Dominick's death, on March 5, 2001, the Stearns County Sheriff's Department received the final autopsy report from the medical examiner's office. The examiner classified Dominick's death as a homicide. When Ruprecht learned that Dominick's death was being classified as a homicide, she told investigators that the night Dominick died Asfeld had woken her up when he arrived, she had spoken with him briefly, gone back to bed, fallen asleep, and then awoke again when she heard his car leave some time later. She explained her earlier contrary statements by stating that Asfeld had asked her to lie. She also told investigators that Asfeld had physically abused her during their relationship. In cooperation with the investigators, Ruprecht called Asfeld and allowed the conversation to be taped. She told Asfeld that Dominick's death had been ruled a homicide and said "it's your fault and you know it is," to which he responded, "[y]ou knew it was from the start." Later in the conversation, Asfeld laughed and said, "you're going to prison, too?" Ruprecht asked, "For what? For letting you into the house?" and Asfeld stated, "It's your word against mine now."

Asfeld was arrested shortly thereafter and on April 12, 2001, an indictment was filed charging him with five counts: premeditated murder in the first degree, Minn.Stat. § 609.185(1) (2002); child abuse murder in the first degree, Minn.Stat. § 609.185(5) (2002); domestic abuse murder in the first degree, Minn.Stat. § 609.185(6) (2002); second degree intentional murder, Minn.Stat. § 609.19, subd. 1(1) (2002); and violation of an order for protection, Minn.Stat. § 518B.01, subd. 14(a), (b) (2002). Asfeld's jury trial began on December 5, 2001.

At Asfeld's trial, a forensic pathologist from the Ramsey County Medical Examiner's Office testified that Dominick had died between 11:00 p.m. on October 10 and 3:00 a.m. on October 11. She further testified that the death was a homicide and that Dominick had died from a lack of oxygen due to suffocation. The state submitted testimony about the prior shaking incident, Asfeld's confession to that shaking, Asfeld's presence in the house the night Dominick died, Asfeld's asking Ruprecht to lie about having been asleep while Asfeld was in the house, and Asfeld's taped phone conversation with Ruprecht. The state also submitted evidence of Asfeld's prior assaults against his immediate family. Witnesses testified that Asfeld had repeatedly assaulted his mother, father, brother, and sister. The district court admitted this evidence as going to prove the pattern of prior abuse of the victim or "another family or household member" within the meaning of Minn.Stat. § 609.185(6).

The state also gave notice of its intent to offer *Spreigl* evidence of Asfeld's prior assaults against nonfamily members. It argued that the incidents would be used to

prove identity, intent, and absence of mistake. The prior assaults by Asfeld were (1) an assault of a 13–year–old boy with a beer bottle, and (2) an assault of a woman in her mid-forties. On April 14, 1996, Asfeld hit the boy on the head with a beer bottle because the boy and his friends were allegedly inappropriately staring at Asfeld. On September 6, 1998, Asfeld arrived drunk and uninvited at a Labor Day party thrown by the woman, and when the woman asked him to leave the party, he punched her in the face. Asfeld argued that the evidence was irrelevant and overly prejudicial, but the court determined that the prior assaults were admissible to prove identity.

In his defense, Asfeld presented his theory that it had been Ruprecht who had shaken and later murdered Dominick. He testified that his confession to shaking Dominick had been a lie, and that he only agreed to the lie so that Ruprecht could regain custody instead of having Dominick in foster care. Asfeld asserted that he did not shake Dominick and implied that Ruprecht must have done so between 7:00 and 8:00 p.m. while he was out of the house. In support of this theory, Asfeld presented his own medical expert, Dr. Allan Ingenito, a pediatric neurologist, who testified that Dominick's injuries from the initial shaking could have been inflicted during the evening when Ruprecht was home alone with Dominick.

The state's medical expert testified that Dominick had been shaken during the morning of December 15, 1999, when Asfeld was home alone with him. The state's expert testified that the shaking could not have occurred between 7:00 and 8:00 p.m. because Dominick's sodium level at the time he was admitted to the emergency room was not consistent with that timing. The expert also testified that, based on the age of bone fractures and the presence of an older subdural hematoma, Dominick had been abused prior to the shaking incident. However, Asfeld's medical expert testified that there was no reliable evidence of prior shaking incidents.

On December 20, 2001, the jury returned guilty verdicts on all four murder counts. On January 17, 2002, the district court entered judgment of conviction against Asfeld for first-degree child abuse murder and sentenced him to life imprisonment. Asfeld appealed his conviction, challenging the district court's interpretation of the domestic abuse murder statute, the admission of the *Spreigl* evidence, the sufficiency of the evidence presented at trial to support his conviction, and the effectiveness of his trial counsel. We affirm the conviction.

I.

The first issue we must decide is whether the district court properly applied the domestic abuse statute when it allowed the admission of evidence of Asfeld's prior abuse of his parents and siblings. Asfeld argues that this evidence was improperly admitted. However, he raises this issue for the first time on appeal. We review an objection to the admission of evidence that is raised for the first time on appeal only if the admission was plain error. *State v. Patterson,* 587 N.W.2d 45, 52 (Minn.1998). Because Asfeld failed to preserve this issue for appeal by objecting below, we review his objection under the following plain error standard: (1) was there an error; (2) was the error plain; and (3) did the error affect substantial rights? *State v. Griller,* 583 N.W.2d 736, 740–41 (Minn. 1998).

Asfeld claims that the district court committed plain error in admitting evidence of his prior abuse against his parents and siblings as going to prove an element of the domestic abuse statute, Minn.Stat.

§ 609.185(6). The statute provides that a person is guilty of murder in the first degree if he

> causes the death of a human being while committing domestic abuse, when the perpetrator ·has engaged in a past pattern of domestic abuse upon the victim or upon another family or household member and the death occurs under circumstances manifesting an extreme indifference to human life;
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> For purposes of paragraph (a), clause (6), "domestic abuse" means an act that &ast; &ast; &ast; is committed against the victim who is a family or household member as defined in section 518B.01, subdivision 2, paragraph (b).

Minn.Stat. § 609.185(6). Section 518B.01, subdivision 2, paragraph (b) defines "family or household members" to include "(1) spouses and former spouses; (2) parents and children; (3) persons related by blood; [and] (4) persons who are presently residing together or who have resided together in the past." Minn.Stat. § 518B.01, subd. 2(b) (2002).

■ Asfeld argues that the statute requires a past pattern of domestic abuse upon the victim or upon another family or household member [of the victim and the perpetrator]. The state argues that the statute requires a past pattern of domestic abuse upon the victim or upon another family or household member [of the perpetrator]. This issue requires that we interpret Minn.Stat. § 609.185. In statutory interpretation, "where the language of the statute is clear, the court is bound to give effect thereto." *State v. Loge*, 608 N.W.2d 152, 156–57 (Minn.2000). We will not engage in an analysis of legislative history if the language of the statute is clear. *See, e.g., Gomon v. Northland Family Physicians, Ltd.*, 645 N.W.2d 413, 416 (Minn. 2002); Minn.Stat. § 645.16 (2002).

The contested language in the statute is the clause "past pattern of domestic abuse upon the victim *or upon another family or household member*." Minn.Stat. § 609.185(6) (emphasis added). The question presented is of which "family or household" the prior subject of abuse must be a member-the victim's, the perpetrator's, or a "family or household" shared by the victim and the perpetrator? In answering this question, we first look to the definition of domestic abuse in the statute: " 'domestic abuse' means an act that &ast; &ast; &ast; is committed against the victim who is a family or household member." Minn.Stat. § 609.185. In this clause, the statute establishes that the victim of domestic abuse must be a member of the perpetrator's "family or household." Therefore, in stating that the past pattern of abuse must have been committed "upon the victim or upon *another* family or household member," the legislature creates a parallel between the victim as one "family or household member" and the prior subject of abuse as another "family or household member." *Id.* (emphasis added). Because of this parallel construction, we look to the definition of "family or household" as it applies to the victim to determine how it applies to the other "family or household member." When we do this, it becomes clear that the statute defines "family or household" as it relates to this other member to be the perpetrator's "family or household."

We recognize that when statutory language is "clear and free of all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit." Minn.Stat. § 645.16 (2002). Because we conclude that the statutory language here is unambiguous, we decline to examine the statute's legislative history as Asfeld urges us to do. We decline to read into the statute a requirement that the

murder victim and the prior victims of abuse be members of the same "family or household," as long as each was a member of the perpetrator's "family or household."

We conclude that such a focus on the perpetrator's "family or household" is proper in the context of the domestic abuse statute, which addresses the behavior of the perpetrator-the abuse the perpetrator inflicts on members of *his* family or household. How the victims of that abuse are related is not controlling. With the domestic abuse murder statute, the legislature sought to penalize the repeat abuser who engages in a history of serial acts of violence against those with whom he lives, whether they be persons to whom he is related or merely persons with whom he currently resides or with whom he has resided in the past.

■ The admissibility of the past acts of abuse is especially clear in this case where the defendant, the murder victim, and the victims of the past abuse were all members of the same "family or household." Dominick was Asfeld's son and Dominick was, therefore, "related by blood" to Asfeld's parents and siblings. Minn.Stat. § 518B.01, subd. 2(b). Asfeld, his parents, siblings, and his son are all members of one "family or household" under the definition provided by Minn.Stat. § 518B.01, subd. 2(b)(3). Therefore, we hold that the district court did not err in admitting evidence of Asfeld's prior acts of abuse against his parents and siblings as direct evidence going to prove the element of a "past pattern of domestic abuse upon the victim or upon another family or household member." Minn.Stat. § 609.185(6).

## II.

■ The next issue before us is whether the district court erred in admitting *Spreigl* evidence of Asfeld's prior assaults against nonfamily members. In re-viewing the admission of *Spreigl* evidence, we have stated that the discretion exercised by the court will be affirmed on appeal absent an abuse of discretion. *State v. Moorman,* 505 N.W.2d 593, 601 (Minn.1993). As the appellant, Asfeld has the burden of showing that the court erred in admitting this evidence. *Id.*

*Spreigl* evidence is evidence of a defendant's prior crimes, wrongs, or acts, which would otherwise be inadmissible, but which the state can seek to have admitted for the limited purpose of showing motive, intent, absence of mistake, identity, or a common scheme or plan. *State v. Stewart,* 643 N.W.2d 281, 296 (Minn.2002). In *State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965), we provided a five-prong test for evaluating when to admit such evidence: (1) the state must give notice of its intent to admit the evidence; (2) the state must clearly indicate what the evidence will be offered to prove; (3) there must be clear and convincing evidence that the defendant participated in the prior act; (4) the evidence must be relevant and material to the state's case; and (5) the probative value of the evidence must not be outweighed by its potential prejudice to the defendant. *Stewart,* 643 N.W.2d at 296.

Here, the state offered testimony about two *Spreigl* incidents: Asfeld's assault of a 13–year–old boy because Asfeld felt the boy was staring at him, and Asfeld's assault of a woman in her mid-forties when she asked him to leave her house during a party. The district court determined that the incidents were relevant to the issue of "identity" and admitted the incidents as demonstrating Asfeld's "callous attitude towards vulnerable people." Asfeld concedes that the first three prongs of the *Spreigl* test were met, but he asserts that the admission of this evidence failed to meet the fourth and fifth prongs: relevancy and lack of undue prejudice.

In evaluating the relevancy factor of the *Spreigl* test, "the trial court should consider the issues in the case, the reasons and need for the evidence, and whether there is a sufficiently close relationship between the charged offense and the *Spreigl* offense in time, place or modus operandi." *State v. Kennedy,* 585 N.W.2d 385, 390 (Minn.1998). It is not necessary, however, that the *Spreigl* evidence be identical to the charged offense. *State v. Nelson,* 632 N.W.2d 193, 204 (Minn.2001). "[T]his court will uphold admissibility notwithstanding a lack of proximity in time or place if the relevance of the evidence is otherwise clear." *State v. Drieman,* 457 N.W.2d 703, 710 (Minn.1990).

Asfeld argues that when *Spreigl* evidence is offered to prove identity, the relevancy standard is heightened and the court should look for resemblances between the methodologies of the crimes, and not merely at whether they are "the same generic type" of crimes. *State v. Shannon,* 583 N.W.2d 579, 581, 585–86 (Minn. 1998). Asfeld relies largely on *Shannon,* in which we concluded that the district court improperly admitted *Spreigl* evidence of a drug-related robbery and shooting that had no clear gang connection to the charged offense of a gang-related killing. *Id.*

The state responds that we have previously affirmed the admission of *Spreigl* evidence by relying on relevancy connections similar to the one the district court used here-that all the acts are instances of taking advantage of vulnerable people. In *State v. Drieman,* we affirmed the admission of evidence that the defendant assaulted a disabled fellow prison inmate 9½ years before his trial for the murder of his girlfriend's 3–year–old son. 457 N.W.2d at 709–11. We allowed the evidence on the ground that both incidents involved taking advantage of vulnerable people. *Id.* In

*State v. Berry,* we stated that three prior incidents of the defendant's violence, which bore little resemblance to each other or to the charged offense of first-degree premeditated murder, were "relevant because of the similarity of the way appellant behaved when trying to maintain control of the people with whom he worked." 484 N.W.2d 14, 17 (Minn.1992).

We note that while we have affirmed a district court's determination that prior bad act evidence is relevant to identity simply because it indicates a pattern of taking advantage of vulnerable people, we have never defined "vulnerable" so broadly as to encompass the evidence admitted in this case. The three individuals at issue here are an infant asleep in his crib, a 13–year–old boy hanging out with friends in a parking lot, and a healthy middle-aged woman hosting a party in her home. Undoubtedly, Dominick was a vulnerable person. However, if we were to allow evidence of the assaults of the last two individuals as helping to establish a pattern of aggression toward "vulnerable" individuals, it is difficult to imagine any prior act of assault that would not be admissible under that standard.

Certainly there are circumstances in which a 13–year–old boy or a middle-aged woman could be classified as "vulnerable," just as there were circumstances in *State v. Drieman* that led the district court to label the prison inmate as "vulnerable," when the defendant was one of a group of attackers and the victim-inmate "suffer[ed] from muscular dystrophy and blindness in his right eye * * * [and] was 6 feet tall and weighed 110 pounds." *Drieman,* 457 N.W.2d at 710. Such circumstances are not present here. In the absence of similarly compelling circumstances, we hold that the district court erred in admitting evidence of the assaults of the 13–year–old boy and the middle-aged woman as evi-

dence of a pattern of aggression toward vulnerable individuals.

■ Having determined that the district court improperly admitted evidence of these two prior assaults, we must now determine whether that error requires that Asfeld be granted a new trial: "a new trial is not required unless there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *Stewart*, 643 N.W.2d at 298. *See also State v. Bolte*, 530 N.W.2d 191, 198, 198 n. 6 (Minn.1995) (distinguishing between harmless error standards for evidentiary rulings of a constitutional magnitude and erroneously admitted state's evidence which does not affect constitutional rights). Here, the jury heard evidence of Asfeld's abuse of his parents and siblings; it heard, and apparently believed, evidence indicating that Asfeld had previously shaken Dominick resulting in severe injuries; and it heard, and apparently did not believe, Asfeld's testimony that he did not abuse or murder his son. We hold that there is no reasonable possibility that the wrongfully admitted evidence of the two prior assaults of two nonfamily or household members affected the guilty verdicts in this case and therefore the error was harmless.

## III.

■ The next issue we address is Asfeld's assertion that the evidence presented at trial was insufficient to support his conviction. When reviewing a claim for sufficiency of the evidence, we are "limited to ascertaining whether, given the facts in the record and any legitimate inferences that can be drawn from those facts, a jury could reasonably find that the defendant was guilty of the charged offense." *State v. Pierson*, 530 N.W.2d 784, 787 (Minn.1995). In reviewing a jury verdict, we view the evidence in the light most favorable to the verdict and assume the jury believed the state's witnesses and disbelieved contrary evidence. *State v. Brocks*, 587 N.W.2d 37, 42 (Minn.1998).

■ Asfeld argues that his conviction was based purely on circumstantial evidence and that "[a] conviction based on circumstantial evidence merits stricter scrutiny." *State v. Bias*, 419 N.W.2d 480, 484 (Minn.1988). A defendant challenging a conviction based on circumstantial evidence need show that the evidence in the record and reasonable inferences that can be drawn therefrom are consistent with a rational hypothesis other than his guilt. *State v. Hatfield*, 639 N.W.2d 372, 376 (Minn.2002) (citing *State v. Steinbuch*, 514 N.W.2d 793, 798–99 (Minn.1994)). "Circumstantial evidence must form a complete chain that, in view of the evidence as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Taylor*, 650 N.W.2d 190, 206 (Minn.2002).

■ Even in cases based on circumstantial evidence, however, we have consistently recognized that the jury is in the best position to evaluate the evidence, and we "will not overturn a conviction based on circumstantial evidence on the basis of mere conjecture." *State v. Lahue*, 585 N.W.2d 785, 789 (Minn.1998). We have defined the defendant's burden:

> [In order to] successfully challenge a conviction based upon circumstantial evidence, a defendant must point to evidence in the record that is consistent with a rational theory other than guilt. However, 'possibilities of innocence do not require reversal of a jury verdict so long as the evidence taken as a whole makes such theories seem unreasonable.'

*Taylor*, 650 N.W.2d at 206 (citations omitted).

The state presented a case against Asfeld that included the following evidentiary "links": Asfeld (1) had previously shaken Dominick, which he had admitted; (2) had exhibited little interest in Dominick after he was discharged from the hospital, as evidenced by testimony that Asfeld had missed most of the doctor visits and most of the opportunities to visit Dominick in foster care; (3) had difficulty controlling his aggression when he felt a loss of control, supported by evidence of unprovoked prior assaults against a 13–year–old boy and a middle-aged woman; (4) had engaged in a long history of domestic abuse, supported by testimony about his abuse of Ruprecht, his parents, and his siblings; (5) wanted to move back into the house he shared with Ruprecht and was prevented from doing so because he was not permitted to live with Dominick; (6) was not interested in paying child support, as evidenced by his failure to pay support and the OFP ordering that he do so; (7) was in the house the night that Dominick died; (8) encouraged Ruprecht to lie and not admit to having fallen asleep while he was visiting so it would seem that he had not had an opportunity to be alone with Dominick; and (9) made statements about Dominick's murder investigation during a taped phone call with Ruprecht that could be viewed as incriminating.

■ Asfeld's first insufficiency argument is that once it is established that several of the evidentiary "links" listed above were improperly admitted, his conviction cannot stand because each link in the circumstantial evidence chain must be proven: "the loss of one link may prevent the state from meeting its evidentiary burden." *State v. Zanter,* 535 N.W.2d 624, 631 (Minn.1995). Asfeld contends that the weak evidentiary links include the improperly admitted evidence of his prior assaults of his family and of two strangers, and his recanted confession to having shaken Dominick.[1] We have determined that the evidence of Asfeld's prior abuse of his parents and siblings was properly admitted. Asfeld recanted his confession to shaking Dominick and testified at trial that he only confessed because he wanted Ruprecht to get custody; but he cannot now claim that the state failed to meet its burden simply because the jury did not believe him. While we agree with Asfeld that the *Spreigl* evidence relating to the assaults on the 13–year–old boy and the middle-aged woman was improperly admitted, we have also determined that the admission was harmless error and do not conclude that the chain of circumstantial evidence would have been significantly weakened by the removal of that "link."

■ Next, Asfeld asserts that the evidence was insufficient because the circumstantial evidence points to Ruprecht as strongly as it does to him and, therefore, the inferences that can be drawn from the evidence "are consistent with a rational hypothesis other than * * * [his] guilt." *Hatfield,* 639 N.W.2d at 376. In support of this argument, Asfeld cites to his trial testimony, in which he described Ruprecht as someone who never wanted a baby and who did not enjoy her life with Asfeld and Dominick. He also cites the testimony of one of his expert witnesses, Dr. Ingenito,

1. Asfeld also asserted that the evidentiary chain is insufficient to support his conviction because the state failed to explain how he, after a full day of combining, could have smothered his son without leaving any evidence of dust or debris on the baby blanket. As we have previously held, however, in the absence of evidence "in the record that is consistent with a rational theory other than guilt," a lack of incriminating physical evidence does not necessarily undermine a guilty verdict. *Taylor,* 650 N.W.2d at 206; *see State v. Landin,* 472 N.W.2d 854, 858 (Minn.1991).

who testified that Dominick's injuries from the initial shaking could have been inflicted in the evening when Ruprecht was home alone with Dominick.[2] Asfeld submits that given that he and Ruprecht are the only two persons who could arguably be viewed as having been present at both the shaking and then the murder of Dominick, and given that both deny responsibility for the two incidents, the case is properly characterized as her word against his.

Asfeld's characterization, however, is precisely the kind of situation in which we apply the presumption that the jury, in its role as evaluator of witness credibility, believed the state's witnesses and disbelieved the defense witnesses. *Brocks*, 587 N.W.2d at 42. Previously, when presented with a defendant who made a claim similar to Asfeld's and stated that the circumstantial evidence at his trial also supported his "unknown killer" theory, we stated that we "assume that the jury disbelieved *any testimony* in conflict with the result it reached." *State v. Morris*, 606 N.W.2d 430 (Minn.2000) (emphasis added). In this case, that requires assuming that the jury disbelieved Asfeld's claim that he did not murder Dominick. Accordingly, for all the reasons noted above, we hold that there was sufficient evidence to support the jury's verdict that Asfeld was guilty of murdering Dominick.

## IV.

Finally, Asfeld asserts that he was denied effective assistance of counsel because his attorney failed to object to the presentation of evidence of the prior domestic abuse against his parents and siblings under Minn.Stat. § 609.185(6). When determining that this prior domestic abuse evidence was not admitted in error, we have

also addressed this claim; therefore, Asfeld's ineffective assistance of counsel claim fails.

Affirmed.

---

2. This testimony was offered to contradict the state's expert witness testimony that Dominick's injuries could only have been sustained if he had been shaken in the morning when Asfeld was the only person home with Dominick.