*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-1300**

State of Minnesota,
Respondent,

vs.

Donald James Miller,
Appellant.

**Filed June 17, 2024**
**Affirmed**
**Connolly, Judge**

St. Louis County District Court
File No. 69VI-CR-21-1390

Keith Ellison, Attorney General, Lydia Villalva Lijo, Assistant Attorney General, St. Paul, Minnesota; and

Kimberly J. Maki, St. Louis County Attorney, Duluth, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Chang Y. Lau, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Wheelock, Presiding Judge; Connolly, Judge; and Ede, Judge.

**NONPRECEDENTIAL OPINION**

**CONNOLLY**, Judge

Appellant challenges his conviction for conspiracy to commit first-degree premeditated murder, arguing that the evidence was insufficient to prove that the conspirators intended to cause the victim's death and that the district court erred in

admitting evidence that appellant had considered or planned the death of individuals other than the victim. We affirm the conviction.

## FACTS

Dylan Peterson began working for L.B. at her printshop in Babbitt, Minnesota, in 2021, and he loaned her some money. In June and July 2021, Peterson held phone conversations with appellant Donald Miller. Because appellant was incarcerated, the phone conversations were recorded.

During the phone conversations, appellant told Peterson that L.B. was stealing from him and made comments such as "[t]his girl's gotta go," "she gotta lose everything," and "she's gone." On July 7, 2021, Peterson asked appellant, "[S]o your opinion is to do the dang thing like send a nuclear bomb over there, huh?" and appellant answered, "Yup, yeah, that's gotta happen," and Peterson replied, "Yeah . . . I agree with it right. I agree." Two days later, appellant told Peterson, "Set that bomb off, homie, set the bomb," and they each voted "Yes" to a decision to "light this mother------ off." The next day, July 10, 2021, appellant informed his girlfriend over the phone that he had told someone he could kill L.B. and "not lose a wink of sleep."

That same day, an assailant wearing a helmet came to L.B.'s workplace and stabbed L.B. with an ice pick three times in the stomach, once in the leg, and once in the hand. L.B. later identified Peterson as the assailant by his tattoo, his way of walking, and his helmet. On July 30, 2021, appellant told his girlfriend during a phone call that he was sorry L.B. had not died as a result of Peterson's assault.

2

Appellant was charged with conspiracy to commit first-degree premeditated murder. During the trial, the jury heard recordings of the phone calls, and the jurors' request to hear them a second time during deliberations was granted. Appellant was found guilty as charged and sentenced to 240 months in prison.

On appeal, appellant argues in his principal brief that the evidence was insufficient to prove that appellant and Peterson conspired to kill L.B. and that admitting the recorded phone calls into evidence was plain error that affected appellant's substantial rights and entitles him to a new trial. In a pro se supplemental brief, he argues that the slang used by himself and Peterson should not have been interpreted to indicate an intent to murder, that the evidence was insufficient to prove that appellant conspired with Peterson to murder L.B. because of uncertainty as to Peterson's identity as L.B.'s assailant, and that the fact that L.B. was stabbed in the leg indicated there was no intent to murder.

## DECISION

### 1. Sufficiency of the Evidence

Criminal conspiracy is established by evidence indicating that the defendant agreed with at least one other person to commit a crime and that at least one conspirator did an act to further that agreement. *State v. Hatfield*, 639 N.W.2d 372, 377 (Minn. 2002); Minn. Stat. § 609.175 (2020). Appellant does not dispute that he conspired with Peterson to commit a crime; instead, he argues that the crime was not the murder of L.B. but an assault resulting in great bodily harm to her. Premeditation and intent to kill are usually proved through circumstantial evidence. *State v. Colgrove*, 996 N.W.2d 145, 150 (Minn. 2023).

3

When the evidence for an element of a conviction is based on circumstantial evidence, we apply a heightened, two-step standard of review to decide whether the evidence is sufficient. But even when reviewing a conviction based on circumstantial evidence, we recognize that the jury determines the credibility and weight given to the testimony of individual witnesses. This stricter standard still recognizes a jury is in the best position to evaluate the circumstantial evidence surrounding the crime.

*Id.* (citations and quotations omitted).

The first step in this process is identifying the circumstances proved; the second is independently examining the reasonableness of all inferences that might be drawn from the circumstances.

The State's circumstantial evidence is sufficient when the reasonable inferences are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than guilt. In evaluating the inferences that may be drawn from the circumstances proved, we review the circumstantial evidence not as isolated facts, but as a whole. The circumstantial evidence standard does not allow us to analyze and parse each fact in a piecemeal fashion to conclude that a hypothesis is reasonable. And we do not set aside verdicts based on speculation.

*Id*. (quotations and citations omitted).

The phone calls between appellant and Peterson and between appellant and his girlfriend prove that he and Peterson hated L.B., wanted her out of the way, and agreed that Peterson would get her out of the way. In one call, appellant said that if, on a prior occasion, L.B. had refused to leave his girlfriend's house, he would have killed and dismembered L.B.; in another call, he said that he could kill L.B. himself without losing any sleep, and in a third, after the assault, he said he was sorry L.B. had not died as a result of it. A

4

defendant's statement that he did not regret killing the victim has been found to be "compelling evidence" of the defendant's intent to kill. *State v. McInnis*, 962 N.W.2d 874, 890 (Minn. 2021).

Appellant concedes that, "[b]ased on these circumstances [the circumstances proved], it is reasonable to infer [a]ppellant and Peterson conspired to commit first-degree murder against [L.B.]," but he argues that "the circumstantial evidence was insufficient as a matter of law because it separately allowed for the reasonable inference that [appellant] and Peterson conspired to commit first-degree assault against [L.B.], that is, to cause the harm that [she] ultimately incurred—great bodily harm." But death is the ultimate bodily harm, and appellant does not explain how it would be possible to plan to commit first-degree murder against someone *without* also planning to do that person great bodily harm.

Moreover, in the phone calls there is no reference to any bodily harm except killing and no indication that L.B. was expected to survive Peterson's assault. L.B. was unarmed when Peterson approached her and stabbed her three times in the stomach and in the leg and hand, then fled. An assailant who stabbed a victim in the back and in the neck, then ran away, was found to have an intent to kill. *Colgrove*, 996 N.W.2d at 152-53. "With intent to" means that "the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." Minn. Stat. § 609.02, subd. 9(4) (2020). "[T]he fact-finder may infer that a person intends the natural and probable consequences of that person's actions" and "[a] jury may infer a person's intent to kill from the nature of the killing." *Colgrove*, 996 N.W.2d at 152. Appellant also argues that the fact that Peterson stabbed L.B. in the leg was a "strong indication that appellant

5

and Peterson intended [L.B.] to suffer great bodily harm rather than death." But Peterson did not stab L.B. only in the leg, and his stabbing her three times in the stomach, thus endangering her vital organs, was a "strong indication" that he intended to kill her.

Finally, appellant argues that, while the fact that he and Peterson spoke of killing people other than L.B. "could be interpreted to support the theory that [appellant, when he agreed with Peterson to 'light the bomb,' meant he wanted Peterson to kill [L.B.]," it could also have been "simply bluster." But appellant's phone calls with Peterson were being monitored; they would not have been expected to use explicit terms such as "murder" and "kill" or to discuss how L.B. would be killed. Moreover, Peterson's convictions for stabbing one person once in the leg a month before he stabbed L.B. and another person in the leg and arms six months after he stabbed L.B. would support the inferences that, when Peterson stabbed L.B. repeatedly in the stomach, he intended to inflict death, not merely great bodily harm, and that he and appellant planned her death, not an assault. *See State v. Peterson*, A23-0732, 2024 WL 1987791, at *1 (Minn. App. May 6, 2024), *petition for rev. filed* (Minn. Jun 5, 2024). Applying the circumstantial evidence standard, we conclude that there is sufficient evidence underlying appellant's conviction because the only reasonable inference supported by the record is guilt.

## II. Admission of recorded phone calls into evidence

Appellant's counsel asked that the state be prohibited from redacting the transcripts of his phone calls; the request was denied. In closing argument, appellant's counsel pointed out to the jury that, when the phone calls were made, appellant was isolated in segregation, not thinking clearly, and speaking in an environment where coarse or violent language was

6

commonly used. Appellant now argues that the district court, sua sponte, should have stricken the parts of the phone calls concerning appellant's thoughts of killing Peterson, Peterson's girlfriend, and others. But not only did appellant not object to having the entire calls played; he based his entire defense on the calls.

An unobjected-to error cannot be reviewed on appeal unless (1) there was an error, (2) it was plain, and (3) its admission affected the substantial rights of the party opposing admission. *State v. Vick*, 632 N.W.2d 676, 685 (Minn. 2001). Substantial rights are affected if "there is a reasonable likelihood that the absence of the error would have had a significant effect on the jury's verdict." *State v. Horst*, 880 N.W.2d 24, 38 (Minn. 2016) (quotation omitted). The fourth prong of the plain-error test is that failure to correct the error will affect the fairness, integrity, and public reputation of judicial proceedings, and this prong is satisfied only "in those circumstances in which a miscarriage of justice would otherwise result." *State v. Huber*, 877 N.W.2d 519, 528 (Minn. 2016) (citations omitted).

Appellant argues first that the statements concerning his thoughts about killing Peterson and Peterson's girlfriend were irrelevant and cumulative. But the statements supported appellant's defense theory that, while he was in segregation, he was not thinking rationally and therefore not responsible for what he said. There was no other support in the record for this defense theory. The district court did not err, still less plainly err, in failing to exclude appellant's statements sua sponte.

Appellant also argues that, because the recorded calls were played as part of the state's examination of the final witness, the jurors had heard it just before deliberating and were influenced because it was recent. But, after the recordings were played, the witness

7

was cross-examined, there was a two-hour lunch break, and the trial was adjourned until the next day. Because about 24 hours separated the jury's hearing the recordings from its deliberations, the jury would not have been influenced by the recordings when it was deliberating

Finally, the likelihood that appellant's phone calls with Peterson concerning L.B. and their plans for her would not have been sufficient to convict him of conspiring to murder her is minimal. Appellant himself concedes that the circumstances proved made it "reasonable to infer [a]ppellant and Peterson conspired to commit first-degree premeditated murder against [L.B.]," so the jury's inference that they had done this was not dependent on the parts of the phone calls appellant now claims were erroneously admitted.

## III. Supplemental Brief Issues

Claims in a pro se supplemental brief that lack "argument or citation to legal authority in support" are deemed waived. *State v. Krosch*, 642 N.W.2d 713, 719 (Minn. 2002). This court does not consider such arguments unless prejudicial error is "obvious on mere inspection." *State v. Bartylla*, 755 N.W.2d 8, 23 (Minn. 2008).[1]

---

[1] At the beginning of his pro se brief, appellant writes "'A conviction may not be obtained simply by piling inference on top of [i]nference,'" and under that statement "U.S. v. Vallo, 238 F.3d 1242" and "U.S. v. Ruiz, 105 F.3d 1492." The full citations for the quoted language, or parts of it, are *United States v. Vallo*, 238 F.3d 1242, 1247 (10th Cir. 2001) and *United States v. Ruiz*, 105 F.3d 1492, 1500 (1st Cir. 1997). However, appellant provides no application of either the cases or the quoted material to his claims, which therefore are without "argument or citation to legal authority"; thus, he has waived them. *See Krosch*, 642 N.W.2d at 719.

**A. The Slang Used by Appellant and Peterson**

Appellant argues that the jury would have had to realize that the words "nuclear bomb" and "deadly damage" were slang terms for murder to conclude that he and Peterson were conspiring to murder L.B. But the term "deadly damage" is a way of saying "killing," and a nuclear bomb is known to cause death. As noted earlier, appellant, who was then incarcerated, and Peterson would not have been likely to use the actual word "murder" in a conversation they knew was being recorded.

**B. Identification of the Assailant**

Appellant argues that the state did not identify the assailant but said that appellant's guilt of conspiracy to murder L.B. did not depend on who attacked her. This was true: to find appellant guilty, the jury had to find that appellant and one or more other parties had agreed to kill L.B. and that at least one party to the agreement took an overt step in pursuit of that objective. It was not required to determine who took the step; appellant was not charged with or being tried for the attempted murder of L.B..

**C. Location of the Stab Wound.**

Appellant argues that the jury could have inferred that a person who intended to kill another person by stabbing would not stab in the leg. If L.B. had been stabbed only in the leg, lack of intent to kill might be a reasonable inference, but the assailant stabbed L.B. three times in the stomach, and those wounds were ample evidence of intent to kill, regardless of whether she was also stabbed somewhere else.

Even if appellant's pro se arguments had not been waived by lack of legal argument or citation, we see no merit in them.

**Affirmed.**